COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Liaison Counsel

LERACH COUGHLIN STOIA                   LERACH COUGHLIN STOIA
  GELLER RUDMAN                           GELLER RUDMAN
  & ROBBINS LLP                           & ROBBINS LLP
SAMUEL H. RUDMAN                        ARTHUR C. LEAHY
DAVID A. ROSENFELD                      MATTHEW P. SIBEN
MARIO ALBA, JR.                         655 West Broadway, Suite 1900
200 Broadhollow Road, Suite 406         San Diego, CA  92101
Melville, NY  11747                     Telephone:  619/231-1058
Telephone:  631/367-7100                619/231-7423 (fax)
631/367-1173 (fax)

Lead Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOWARD CHARATZ, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> AVAYA, INC., et al., <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) |

No. 3:05-cv-02319-SRC-TJB
**(Consolidated)**

<u>CLASS ACTION</u>

CONSOLIDATED COMPLAINT FOR
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS

## NATURE OF THE ACTION

1.    This is a federal class action on behalf of purchasers of the publicly traded securities of Avaya, Inc. ("Avaya" or the "Company") between October 5, 2004 and April 19, 2005, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## BACKGROUND AND INTRODUCTION

2.    Defendant Avaya sells communications (mainly telecommunications) equipment, applications and services to businesses, government agencies and other organizations.

3.    Avaya came into being in September 2000, the result of its parent company Lucent Technologies Inc. spinning off the smaller subsidiary. A number of Avaya's senior management and directors – including both of the Individual Defendants – joined Avaya directly from senior positions with Lucent. In the fall and winter of 2000, while Avaya was still in its infancy as a publicly traded company, Lucent uncovered accounting problems in its business and became the target of a formal SEC investigation for securities fraud that caused its stock price to plummet. While Lucent subsequently settled the SEC investigation, Avaya had trouble escaping from the shadows of its progenitor causing doubts and concerns (in addition to a floundering telecommunications industry) to plague the fledgling enterprise.

4.    Whereas Avaya stock had initially been valued at $15 upon its issuance in September 2000, by July 2002 the Company's stock traded at less than $2. The

price did not quickly rebound. Avaya did not return to its initial valuation of $15 per share until 2004.

5.     When Avaya's stock price finally did rise out of the single digits, the Individual Defendants were able to begin implementing their plan to grow Avaya's business into that of a major global competitor. Accordingly, in August 2004 Avaya purchased a majority interest in the Indian telecommunications company Tata Telecom Ltd. Following the August purchase, on October 4, 2004 Avaya finalized its acquisition of Spectel plc, an Irish telecommunications company.

6.     On October 5, 2004, the beginning of plaintiffs' Class Period, defendants announced Avaya's purchase of Tenovis Germany GmbH ("Tenovis"), a major European provider of enterprise communications systems and services. Prior to the acquisition, Tenovis was a privately held corporation and the public at large did not have much access to, or know much information about, the strength of its financial condition. Moreover, Avaya did not have a long track record of acquiring and integrating acquisitions. Defendants, however, assured the market that Avaya's acquisition of Tenovis would "have a positive financial impact within a short period of time" and that Avaya had "a process and a plan in place" to integrate Tenovis without Avaya's core business operations suffering. Moreover, to sell the market on Avaya's ability to successfully integrate Tenovis without hurting Avaya's bottom line, defendants publicly reported that the integration costs associated with the integration would be far less than what they knew the Company would incur.

- 2 -

7.    Throughout the Class Period, defendants continued to reassure investors that its acquisition of Tenovis and its integration of the German company into Avaya were going smoothly.  As they would later admit after the Class Period, and according to former Avaya employees who witnessed the integration, the Tenovis integration was requiring significantly more time, effort, and money than the defendants were telling the public.

8.    In addition to investors' interest in the Tenovis acquisition, defendants throughout the Class Period continually spoke with investors about the condition of Avaya's core business in the United States where Avaya faced stiff competition from venerable companies such as Cisco and AT&T Solutions, as well as new upstarts in the arena that were looking to win business away from Avaya by undercutting prices. Thus, many investors focused upon whether Avaya could continue to grow the Company's revenues and still improve margins.  As one equity analyst covering Avaya put it, the key consideration in recommending Avaya was the core Avaya operating margin story.  It was a simple issue for investors:  Could Avaya sell more products and increase profitability, or would an influx of competition drive down pricing and earnings?  For this reason, investors and analysts alike were keenly interested in whether Avaya was experiencing any slippage in its margins (especially operating margin) – in addition to investors' usual focus on revenues and earnings.

9.    Throughout the Class Period, in an effort to increase and maintain Avaya's then thriving stock price, the defendants continually represented that Avaya

- 3 -

was growing the business without sacrificing profitability. Defendants were adamant – time and again defendants told the public Avaya was not experiencing pricing pressures whether they be from Cisco or otherwise. Indeed, throughout the Class Period, defendants continually updated the market – defendants even promised the market to keep it updated – telling investors that Avaya was "on track" to report financial results in line with expectations.

10.     As late as March 2005, the last month of Avaya's second fiscal quarter of fiscal 2005, defendants increased Avaya's financial projections and assured investors on March 2, March 7, and March 10, 2005, that the Company was on target to achieve its financial goals. It was not.

11.     In truth, Avaya's financial results in the second quarter of 2005 were – as one analyst put it after the fact – "horrid." Avaya would miss its earnings estimate by 60% ($0.07 per share compared to consensus expectations of $0.17-$0.18). Avaya operating margins were no where close to the 8.5% to 9% defendants said Avaya was "on track" to achieve. The operating margin was a mere 4.3%. And, Avaya missed its revenue number by almost $100 million.

12.     But, these results were not the product of some anomaly unexpected by defendants. Nor, as defendants would admit after the Class Period, were these results the product of an industry wide phenomenon. As Avaya's CEO, Donald Peterson (a defendant herein), noted, "well over a majority of this shortfall I would attribute more to issues related to us than issues related to the market." Indeed, the shortfall was

- 4 -

directly linked to the very concerns that investors had been asking about all Class Period and which defendants had lied about throughout the Class Period: the integration of Tenovis, whether Avaya was experiencing pricing pressures, and if the go-to-market strategy was succeeding. For instance, defendants repeatedly assured the market that Avaya wasn't experiencing inordinate pricing pressures during the Class Period. By way of example, on March 7 defendant Garry McGuire told investors that Avaya was not experiencing pricing pressure from competition with Cisco. And, on March 10 he told investors: "Pricing has been fairly steady for the last couple of years." Yet, on March 21, 2005, Lehman Brothers issued a research report stating that its analyst had uncovered that Avaya had been granting clients unheralded 30% to 40% price reductions throughout the month of March. Indeed, according to former Avaya employees, Avaya had been experiencing significant pricing pressure throughout the Class Period (including pressure from Cisco).

13.    Defendants' false statements during the Class Period had the desired effect. At the onset of the Class Period on October 5, 2004, Avaya's common stock traded at between $13 and $14. By mid-December, 2004, the stock was consistently trading at $17. However, as truthful information contradicting defendants' false statements began to leak into the market (such as the report issued by Lehman), the price for Avaya stock began to steadily decline. By late-March 2005, Avaya stock was trading at $12, and when Avaya disclosed its actual "horrid" financial results on

- 5 -

April 19, 2005, the stock dropped by 25% in one day on trading 10 times the average daily volume during the Class Period.

14.    Analysts and investors watching the Company expressed outrage.  JP Morgan's analyst was "baffled" by the whole situation and further opined:  "We also find the fact that management could not foresee the downturn in US revenues as late as early March when they upped their own company guidance to 28%+ *as particularly disturbing*. . . ."  It "is *astonishing* to us that management increased annual revenue guidance on March 3rd, just to miss it 46 days later."

15.    Defendants' fraudulent conduct is summarized in the following graphic:

# Avaya Inc.

## Daily Share Pricing: September 1, 2004 to June 29, 2005



## PARTIES

16.     Lead Plaintiff District No. 9, I.A. of M. & A.W. Pension Fund purchased Avaya's publicly traded securities during the Class Period as set forth in its certification attached hereto, and was damaged thereby.

17.     Lead Plaintiff UFCW Local 880 – Retail Food Employers Joint Pension Fund purchased Avaya's publicly traded securities during the Class Period as set forth in its certification attached hereto, and was damaged thereby.

18.     Lead Plaintiff UFCW Local 880 Union-Employer Pension Fund purchased Avaya's publicly traded securities during the Class Period as set forth in its certification attached hereto, and was damaged thereby.

19.     Lead Plaintiff National Elevator Industry Pension Fund purchased Avaya's publicly traded securities during the Class Period as set forth in its certification attached hereto, and was damaged thereby.

20.     Lead Plaintiff City of Livonia Employees' Retirement System purchased Avaya's publicly traded securities during the Class Period as set forth in its certification attached hereto, and was damaged thereby.

21.     Defendant Avaya is a corporation organized under the laws of Delaware, with its principal executive offices located in Basking Ridge, New Jersey.  Avaya provides communication systems, applications and services for enterprises, including businesses, government agencies and other organizations.  Avaya's common stock trades on the New York Stock Exchange under the symbol "AV."  Avaya operates on

a fiscal year ending September 30. Thus, Avaya's fiscal year 2004 ran from October 1, 2003 through September 30, 2004. Avaya's fiscal year 2005 ran from October 1, 2004 through September 30, 2005. Avaya's fiscal year 2006 extends from October 1, 2005 through September 30, 2006.

22.   (a)   Defendant Donald K. Peterson ("Peterson") was throughout the Class Period Avaya's Chairman of the Board of Directors and Chief Executive Officer. During the Class Period, defendant Peterson sold 100,000 Avaya shares for insider trading proceeds of $1.4 million.

(b)   Defendant Garry K. McGuire, Sr. ("McGuire") was throughout the Class Period Avaya's Chief Financial Officer. During the Class Period, defendant McGuire sold 251,760 Avaya shares for insider trading proceeds of $3.7 million.

(c)   Defendants Peterson and McGuire are referred to herein as the "Individual Defendants."

23.   During the Class Period, the Individual Defendants, as senior executive officers and/or directors of Avaya were privy to confidential and proprietary information concerning Avaya, its operations, finances, financial condition and present and future business prospects. The Individual Defendants also had access to material adverse non-public information concerning Avaya, as discussed in detail below. Because of their positions with Avaya, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents,

- 9 -

conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof, and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts contradicting their misrepresentations specified herein had not been disclosed to, and were being concealed from, the investing public.

24.     The Individual Defendants are liable as direct participants in, and as co-conspirators with respect to, the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers and/or directors were "controlling persons" within the meaning of §20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Avaya's business.

25.     The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public.  Thus, the Individual Defendants were authorized agents of the Company, having permission and authority to speak and issue press releases on behalf of Avaya. The Individual Defendants were provided with copies of the Company's reports and

- 10 -

press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

26. As senior executive officers and/or directors and as controlling persons of a publicly-traded company whose common stock was and are registered with the SEC pursuant to the Exchange Act, and was traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to disseminate promptly accurate and truthful information with respect to Avaya's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Avaya's securities would be based upon truthful and accurate information. The Individual Defendants misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

27. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Avaya's publicly traded securities by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding Avaya's business, operations and management and the

- 11 -

intrinsic value of Avaya's securities; (ii) enabled the Individual Defendants to sell

over 350,000 shares of their personally held Avaya common stock at artificially

inflated prices and thereby reap over $5.1 million in gross proceeds; and (iii) caused

plaintiffs and members of the Class to purchase Avaya securities at artificially inflated

prices.

## FALSE AND MISLEADING STATEMENTS
## DURING THE CLASS PERIOD

28.     The Class Period begins on October 5, 2004. On that date, Avaya

announced that it had signed a definitive agreement to acquire Germany-based

Tenovis GmbH & Co. KG ("Tenovis"), "a major European provider of enterprise

communications systems and services." Avaya would pay $370 million in cash and

assume about $265 million in debt. The press release continued, in pertinent part, as

follows:

> "The acquisition of Tenovis significantly enhances Avaya's size
> and scale in Europe, and is a major step in Avaya's plan to grow its
> business globally," said Don Peterson, chairman and CEO, Avaya.
> "Tenovis brings Avaya an integrated sales and services organization and
> an extensive customer base in Europe. ***We have complementary
> businesses and strategies including a common understanding of the
> unique communications needs of the enterprise customer.*** We have a
> shared commitment to provide customers with a strong services
> capability as well as delivering to them the wide range of business
> benefits inherent in IP telephony solutions and applications."
>
> \*       \*       \*
>
> The company said the acquisition is expected to be accretive by
> $0.07 per share in fiscal year 2006, the first full year of combined results.
> Excluding non-recurring costs and start-up expenses of $0.05 per share,
> the acquisition is expected to be dilutive by $0.03 per share in fiscal year

2005. The transaction's impact on fiscal year 2005 results will include approximately nine months of Tenovis results; if a full year's results were included then the transaction would be breakeven in fiscal year 2005 excluding the non-recurring costs and start up expenses.

> ***"Consistent with our corporate development framework, Tenovis is expected to have a positive financial impact within a short period of time, and we will continue to maintain our financial strength and flexibility," said Garry K. McGuire, chief financial officer, Avaya.***

(Footnote omitted.)

29.     After defendants issued the above press release to the market, they held a conference call for analysts and investors in which the defendants made the following false and misleading statements:

**McGuire:**     [T]he addition of Tenovis is an excellent strategic fit.

                    *          *          *

**McGuire:**     ***In addition to being an excellent strategic fit, it's also a strong operational fit.*** Tenovis and Avaya share a number of common elements in terms of our enterprise market focus, product and service revenue mix, direct sales force, and belief in the value of services as a competitive advantage.

**McGuire:**     ***We think this is an important consideration because our complimentary approaches will enable us to more effectively mitigate integration risks, because it will also enable us to more effectively capture and maximize opportunities for growth. We believe these growth and value creation opportunities are substantial.***

                    *          *          *

**Peterson:**     We have also, as you know, greatly improved our profitability and financial strength. We have built a strong cash position and substantially reduced our debt.

**Peterson:**     Our success to date is reflected in the increased market share and mind share that we are winning among our customers.

- 13 -

* * *

**Peterson**:   *Let me also say that we will also continue to maintain our focus on our current business.  We have a process and a plan in place to minimize distractions.  <u>This includes forming a dedicated separate team to handle the integration process</u>*.

* * *

**Peterson**:   *The complimentary nature of Tenovis's business strategy and profile, as well as steps we are taking to handle the integration, will make for a smoother transition.  It will also enable to us move quickly to capture value creation opportunity*.  The impact of the acquisition is positive in terms of the transaction are consistent with, and demonstrate our commitment to building shareholder value.

* * *

**McGuire**:   Let's turn now to discuss the costs we will incur as a result of the acquisition.  First, we expect non-recurring and start-up expenses of about $23 million in fiscal year '05, related primarily to integration, retention, branding, and compliance.  These costs will flow through the P&L and have been reflected in the accretion/dilution I discussed earlier.

**McGuire**:   In addition to this 23 million, we'll also incur about 75 to $80 million in costs that will have no P&L impact.  This includes transaction-related expenses, payment, Tenovis tax liability.  It also includes restructuring costs, some of which relate to actions taken by Tenovis in 2004 that will be funded out in future periods.

* * *

**McGuire**:   Let me sum up by highlighting a few key points about Tenovis in the transaction.  *It's an excellent strategic fit* that makes us a formidable player in the largest region in the world for enterprise telephony.

30.    In addition to the press release and conference call, defendants' statements to numerous analysts covering Avaya (both in the conference call and in follow-up meetings to sell the analysts on the acquisition of Tenovis) were

- 14 -

subsequently published to investors.  For instance, Kaufman Brothers issued a report

on Avaya on October 5, 2004 stating:

> • We reiterate our BUY rating as our confidence is improving that Avaya can continue to report solid revenue increases, expand its operating margins and grow EPS in the mid-20% range for the next few years.

> • Avaya announced an agreement to acquire Tenovis Gmbh & Co., a privately held German-based provider of telecom enterprise equipment. The acquisition significantly strengthens Avaya's presence and opportunity in the EMEA region, an area Avaya has targeted for improvement.

> • We view the terms of the transaction as favorable for Avaya.

31.    Defendants' statements in the press release in ¶28, and to analysts

following the press release as set forth in ¶¶29-30, were each materially false and

misleading when made because defendants failed to disclose and/or misrepresented

the fact that the Tenovis transaction would create substantial problems for Avaya's

business.

32.    According to a former Avaya Technical Manger in the Performance

Communications Group who was at the Company prior to and throughout the Class

Period ("Confidential Witness Number 1" or "CWN1"), Avaya's due diligence on

Tenovis began years before the Class Period.  CWN1 has personal knowledge of all

the facts alleged in this paragraph.  Prior to the acquisition of Tenovis, Avaya knew

the integration would be difficult and would substantially interfere with Avaya's

business because of corporate cultural and linguistic differences between Tenovis (a

German company) and Avaya (primarily an American company).  Such problems

- 15 -

were immediately felt after the announcement of the merger, although it was known

within the Company before the announcement that these problems would be severe.

As a result, the Company became mired in costs it had not properly budgeted for. For

instance, because Avaya and Tenovis sold similar products it was contemplated that

the newly merged Company would combine the best attributes of each product line

together in its new offering. However, it was immediately apparent to all involved

that this process would be substantially more difficult than planned because Tenovis's

employees did not speak English well and because the Tenovis and Avaya employees

each thought their products were better than that of the other. These problems had

very tangible effects on Avaya's bottom line. For instance, Avaya was forced to pay

for interpreters for Tenovis employees, which costs (according to CWN1) exceeded

$10 million in unforeseen costs to Avaya that it could ill-afford. Indeed, according to

CWN1, he had to authorize expenditures for live interpreters that Avaya did not

budget for at all – which caused Avaya to have to cut costs in other areas. The same

was true for conversions of documents from German to English. To accommodate

these un-budgeted costs, Avaya shifted money from other areas of the Company – and

did not accrue all such costs as integration costs. For instance, a $2 million translation

cost was charged to the "main server product-Gateway line" in Avaya's product

budget rather than the integration reserves. All of these un-budgeted costs of

translation were either foreseeable or immediately palpable once the acquisition of

Tenovis was announced, but defendants did not make it publicly known that the

- 16 -

Company was experiencing these problems or re-assess the Company's budgeting guidelines in light of these costs. Defendant McGuire was heavily involved in the due diligence of Tenovis, according to CWN1. CWN1 worked at Avaya's headquarters in Basking Ridge, New Jersey, and he had oversight responsibility for matters concerning research and development and product documentation.

33.    Moreover, defendant Peterson also worked closely on the Tenovis integration according to a former Avaya vice president of Avaya's Executive Relations Program, who worked at the Company at the beginning of the Class Period, or just before the Class Period began, and who observed Peterson's role in the Tenovis acquisition from discussions during Operations meetings ("CWN2"). That the Individual Defendants would be personally involved in the due diligence and integration of Tenovis was a given because Tenovis was one of the largest, if not the largest, acquisitions Avaya had ever made.

34.    Defendants falsely stated that Avaya's management would not lose "focus" on Avaya's business to implement the Tenovis integration, and that it had a "plan in place to minimize distractions," including the formation of a "dedicated separate team to handle the integration process." Indeed, after the Class Period the Individual Defendants admitted that Avaya's U.S. business operations suffered because senior management's focus was not on U.S. operations but on the Tenovis integration as set forth more fully in ¶87(c).

35.     Tenovis was not an "excellent strategic fit" with Avaya, nor a "strong

operational fit," nor was Tenovis' business "complimentary" with that of Avaya.

Among other things, the two companies had numerous overlapping products requiring

the termination of one or the other from the product line.   Moreover, because of

cultural and language barriers the two companies did not "fit" together as defendants

represented and would have to incur substantial undisclosed integration costs to

overcome these language and cultural differences.

36.     Defendants falsely represented that Avaya would incur only $23 million

in non-recurring and start-up costs in connection with the integration.   In fact, because

of the costs of interpreters and other translation costs, Avaya's integration costs were

much greater – a fact Avaya hid from investors by not properly accounting for these

integration costs or setting aside sufficient reserves.

37.     On October 26, 2004, Avaya released its financial and operational results

for the fourth quarter and fiscal year 2004.   The press release stated, in pertinent part,

as follows:

> "*Avaya's results this quarter cap a year of substantial*
> *accomplishment and progress*," said Don Peterson, chairman and CEO,
> Avaya.  "We capitalized on our market leadership in IP telephony and
> delivered accelerating product sales growth through the year.  The U.S.
> continues to lead the transition to IP telephony and in the fourth quarter
> we had double-digit product growth in this key market, both sequentially
> and compared to last year.
>
> "Our international product sales grew at a double-digit rate
> compared to last year and we took major steps to continue this
> momentum.  Our announcement earlier this month of the planned

- 18 -

acquisition of Tenovis will greatly enhance our presence in Europe, making us number three in market share in the region."

\*     \*     \*

"*Avaya completed the fiscal year having delivered on commitments in several key areas*," said Garry K. McGuire, chief financial officer and senior vice president, corporate development, Avaya. "All three business segments were profitable for the year and contributed to the seven percent increase in year-over-year revenues. . . . *We have entered the new year well positioned to translate our ongoing success in the marketplace into enhanced shareholder value.*"

\*     \*     \*

**Highlights from Year**

Since the end of the last quarter, Avaya made a number of corporate and product portfolio announcements:

The company signed a definitive agreement to acquire Tenovis GmbH & Co. KG, a major European provider of enterprise communications systems and services, from affiliates of Kohlberg Kravis Roberts & Co. *After the acquisition is completed, Avaya expects its European revenues would nearly triple, growing from about 12 percent to about 30 percent of Avaya's global business. When fully integrated, Avaya expects Tenovis will add about one billion dollars to its annual revenues.*

38.     After defendants issued the above press release to the market, on October 26 they held a conference call for analysts and investors in which the defendants made the following false and misleading statements:

**Peterson**:     Back when we were just beginning our 2004 fiscal year, we shared with you our views on the enterprise telephony marketplace and our plans to win in this market. We discussed the progress we had made in right sizing our organization and how we had built a business model with substantial operating leverage. We believe that we had the potential to significantly improve our operating margins, our profitability and the financial strength of the firm as revenues increased.

- 19 -

**Peterson**:   We also discussed our leadership position in the market and said that we would build on this position to gain share and grow sales as the technology transition to IP telephony accelerated over the course of 2004. Finally, we said that with a much stronger financial position and greater financial flexibility we would continue to invest in areas that improved our competitive positioning. This in turn would set the stage for continued profitable growth.

**Peterson**:   *As you can see from the results we issued earlier today, 2004 has played out largely according to our expectations.*

*   *   *

**Peterson**:   *Clearly we are enjoying significant momentum in the marketplace, and we are converting that momentum into increased profitability and financial strength. Underlying this momentum are our Company's strategic advantages.*

*   *   *

**Peterson**:   Tenovis will significantly enhance Avaya's size and scale in Europe, and is a major step in our plan to grow our business globally. *Our companies have complementary businesses and strategies which makes Tenovis an excellent strategic fit and operational fit as well.*

*   *   *

**Peterson**:   *The end result is that today we are a stronger more competitive organization that enjoyed significant potential for further – to further build shareholder value.*

39.   In addition, when asked about the Company's operating margins, defendant McGuire falsely stated that he expected continued operating margin improvement for Avaya in 2005. Defendant Peterson also falsely stated:

*I'd say pricing as a general comment is not different than what it has been.* There continues to be, you know, pressure in the market, it's a very competitive marketplace *but I wouldn't say there's anything particularly noteworthy in the trend line one way or the other.*

- 20 -

40.     On the same date that Avaya released its financial results, defendant Peterson was interviewed by DowJones Newswire, the contents of which were published that day: "***Growth in sales of Avaya Inc.'s (AV) telephone systems is accelerating***, complementing the company's services segment which drove the company's performance during the industry downturn, Avaya's chief executive said in an interview Tuesday."

41.     Following Avaya's earnings release and defendants' conference call for investors, analysts covering Avaya released a flurry of reports to the market concerning the Company and praising its business success.

42.     On October 26, 2004, Morgan Stanley issued a research report rating Avaya "Overweight" and concluding "Results support 2005 above consensus estimates." Supporting its conclusion, Morgan Stanley emphasized the importance of Avaya's gross and operating margins:

> We believe gross margin improvement is sustainable and think there is additional opportunities for leverage in the model. We forecast operating margins of 11.3% in F2005, at the low end of the company's target 11-12%.
>
> *            *            *
>
> The leverage story at Avaya remains key and we think the company is on track to generate at least 11% operating margins in F2005 and believe there is upside to the company's F2005 goal of 10-12%. We currently model operating margins of 11.3% in F2005, leading to 77% YoY EPS growth to $0.92 ($0.70 fully taxed), and believe additional leverage can still be found in AV's operating model.

43.     On October 26 Deutsche Bank also issued a positive report on Avaya

reiterating its "Buy" rating on the stock.  Similar to Morgan Stanley, Deutsche Bank

was focused on Avaya's reported and expected margins:

> Outlook and Guidance
>
> ***Our thesis on Avaya is unfolding as expected with significant
> margin improvements taking place as management slowly grows the
> business.***  We believe a leaner, cleaner structure will continue to pay-off
> with significant operating leverage as the company generates modest,
> consistent top line growth
>
> *     *     *
>
> Continued expansion in operating margin to 11.8% by the end of
> FY05 along with 7% top line growth should contribute to EPS of $0.90
> in FY05, up 78% Y/Y.

44.     On October 27, 2004, JP Morgan issued an analyst research report on

Avaya noting the Company had "another solid Qtr" and also dialed in on defendants'

favorable but false statements concerning Avaya's margins and the effects of its

competitors' price competition:

> [O]n the call, ***management indicated that not only are the margins
> likely sustainable but, in fact, there is room for additional
> expansion*** . . . .
>
> ***Pricing pressure remains under control***
>
> ***Management noted that no unusual pricing pressure in the
> quarter affected margins*** and while they expect pricing to continually
> decline, the shift towards products such as higher-margin IP software
> would benefit Avaya's gross margin.  With gross margin holding in the
> high 40% range and operating expenses under control (Q404 opex was
> up seq. from Q3, but inline with our estimate), we believe that Avaya
> should continue to post operating margins north of 10%.

- 22 -

45.     The day after releasing its earnings, defendants spoke at an analyst conference hosted by Prudential.  On October 27, 2004, Prudential Equity Group, LLC issued a summary of defendants' statements at its analyst conference:

### *AV: AVAYA HIGHLIGHTS ITS VOIP MOMENTUM AT THE PRUDENTIAL TECHNOLOGY CONFERENCE*

#### *HIGHLIGHTS*

*   Avaya CFO, Gary McGuire, held a Q&A discussion at the Prudential Technology Conference Wednesday.

*   While competitors have cut prices and may have sacrificed margins on some individual deals, *AV remains committed to growing its share profitably, and it is not seeing any widespread change in the telephone pricing environment*.

*   AV delivered impressive 57.6% product GM in 4Q (up 368bps from 3Q), driven by mfg improvements and volume, product, geographic and channel mix. *AV believes these margins are sustainable* . . . .

46.     Defendants' statements in the press release in ¶37, and to analysts following the press release as set forth in ¶¶38-45, were each materially false and misleading when made because defendants failed to disclose and/or misrepresented the facts set forth in ¶¶31-36 and the following adverse facts, which were known to defendants, or recklessly disregarded by them, at all relevant times:

(a)     Avaya's operational model had broken down resulting in Avaya's inability to compete with the business models of rivals in the industry such as Cisco and AT&T Solutions.  According to a former Global Contract Manager with Avaya ("Confidential Witness Number 3" or "CWN3"), who was at the Company for many years prior to leaving in November 2004 and who participated in the negotiation of

- 23 -

contracts with many of Avaya's biggest clients, Avaya's operational model had essentially broken down in the months prior to his departure. CWN3 has personal knowledge of all the facts alleged in this paragraph. Part of CWN3's duties included work on Avaya's top 40 accounts (known as "Advantage Accounts") in the U.S. It was well-recognized within Avaya that its business model faced significant problems, according to CWN3. For instance, Avaya competitor AT&T Solutions offered its customers an "outsourcing" solution by which all of the client's telephony needs would be grouped in one package. Avaya could offer no such package. Numerous Avaya clients (including Merrill Lynch and mega-client Citigroup whose revenues approximated $100 million a year with Avaya) were then continually putting pressure on Avaya by invoking the "outsourcing" option during negotiations *as a means of winning substantial price concessions*. Indeed, Citigroup was able to force Avaya to accept a 20 percent price reduction (with no corresponding change in services) because Avaya feared losing such a client to "outsourcing."

(b)     Avaya's margins were shrinking in the face of stiff competition, which had long-term negative consequences for the Company that it failed to disclose. According to a former Avaya employee ("Confidential Witness Number 4" or "CWN4") who was at the Company prior to and throughout the Class Period and who was responsible for evaluating the profitability of special bids in the Services organization, Avaya gave substantial discounts to win business in the period leading up to the beginning of the Class Period through May 2005. *Whereas Avaya had*

- 24 -

*previously given discounts in excess of 20 percent approximately 20 percent of the time, between January and May 2005 that number quadrupled to 80 percent of special bids*. According to CWN4, Avaya's sales force pleaded with management to allow such discounting lest clients go elsewhere. Customers that received such discounts in the 2004-2005 time period included some of Avaya's largest customers, such as American Express, Hilton Hotels, Dell and Wynne Resorts. CWN4 explained that in 2004 and 2005 Avaya was facing substantial competition from newer companies that were aggressively pursuing Avaya's customers by competing on price. By way of example, CWN4 explained that one such company, United Assets Coverage, specifically targeted Avaya's customers who received Avaya's Maintenance Software Permission product. In October 2004, defendants learned about United Assets Coverage's tactic to target Avaya customers. Similarly, CWN4 explained that Avaya inherited a large number of low margin, *i.e.*, less profitable, contracts from its acquisition of Expanets in October 2003. According to CWN4, Expanets had a great many smaller clients whose contracts Expanets could profitably manage but which Avaya, because it had a more expensive business model, could not. This problem persisted throughout the Class Period, and by March 2005 Avaya was happy to merely break even on such contracts. CWN4 has personal knowledge of all facts alleged in this paragraph.

(c)     Defendants were then invoking drastic (but unsustainable) measures to maintain profitability. According to CWN3, in the months leading up to

- 25 -

the beginning of the Class Period, defendants realized Avaya's margins on business with relatively small accounts (revenues of $1 million to $2 million per year) had substantially declined and as a result it had become unprofitable to negotiate the terms of contracts with these clients (as such negotiations increased Avaya's costs of business). Thus, the defendants invoked a policy of non-negotiation even though clients wanted individualized contracts and Avaya's competitors were providing such contracts. This led to a decline in Avaya's business as many smaller accounts were lost to competitors. CWN3 has personal knowledge of all facts alleged in this paragraph.

47.    Defendants had misrepresented the truth by indicating "pricing as a general comment is not different than what it has been" and that nothing "noteworthy" in pricing was being witnessed by defendants. Similarly, defendants misled analysts and the market by claiming Avaya's margins were not only "sustainable" but could improve in the future. In fact, as detailed above, Avaya was then experiencing significant pricing pressures in its negotiations with clients, which pricing pressure was resulting in Avaya granting large discounts to clients that would manifest themselves in less-profitable contracts booked in upcoming quarters (as the negotiation process regularly lasted months).

48.    On October 29, 2004, Avaya issued a press release in which it provided financial guidance for fiscal years 2005 and 2006. The press release stated, in pertinent part, as follows:

> *Avaya said its operating margin goal for fiscal year 2005 is between 8.5 percent and 9 percent on fiscal 2005 revenues that are expected to grow by between 25 percent to 27 percent compared to fiscal year 2004 revenues of $4.055 billion. Operating margin for fiscal year 2004 was 7.6 percent. Avaya said the expected growth in fiscal 2005 revenues will come from its existing businesses and the impact of its acquisition of Spectel, its majority interest in Avaya GobalConnect (formerly Tata Telecom), and assuming a Jan. 1, 2005 close of its pending acquisition of Tenovis.*

> *For fiscal year 2006 the company has an operating margin goal of between 10 percent and 12 percent.*

> Avaya reiterated its existing balance sheet goals of maintaining a strong net cash position and keeping debt at a level no higher than its debt level prior to the planned acquisition of Tenovis. The company also said its longer-term goals of improving its credit rating to investment grade, opportunistically deleveraging its balance sheet and maintaining a cash position of approximately one billion dollars remain.

(Footnote omitted.)

49.     After defendants issued the above press release to the market, defendants hosted the 2004 Avaya Financial Analyst Conference during which defendants McGuire and Peterson spoke at length about Avaya's business and financial condition, making numerous false statements about the Company that were published by analysts to the market as set forth below in ¶¶50 and 51.

50.     Following the analyst conference, on November 1, 2004 Kaufman Bros. Equity Research issued a research report stating:

> ***UPBEAT INVESTOR DAY-REVISING MODEL AND RAISING PRICE TARGET-BUY***

> •     Avaya hosted an investor meeting at its headquarters this past Friday.   Management reviewed the substantial improvement in its financial and operational performance during the past fiscal year as well

as its product and go-to-market strategy to capitalize on secular migration to VoIP.

•    We reiterate our BUY rating, as we believe Avaya has the right strategy for the marketplace and can deliver annual EPS growth of 23%-27% over the next several years. Due to our increased confidence in Avaya's outlook and its ability to achieve robust EPS growth, we are raising our price target on $18 from $16.

51.    Of particular importance to analysts covering Avaya, was the defendants' guidance at the Analyst Conference on Avaya's operating margins. As set forth in a November 3, 2004 report issued by JP Morgan:

> **Unraveling the Operating Margin Guidance:** Our punch-line is that Avaya's new operating margin guidance of 8.5-9.0% for fiscal year 2005 post acquisitions, *implies a 10.5-11.0% operating margin for the organic business* that just last quarter posted 10.1% margins, therefore it is not inconsistent with either prior guidance or with the pace of margin expansion that the company is currently experiencing.

52.    Defendants' statements in the press release in ¶48, and to analysts following the press release as set forth in ¶¶49-51, were each materially false and misleading when made because defendants failed to disclose and/or misrepresented the facts set forth previously in ¶¶31-36, 46-47 and the following adverse facts, which were known to defendants, or recklessly disregarded by them, at all relevant times:

(a)    Defendants had no basis for the financial projections they were then making to investors. Defendant McGuire established the financial projections on a "top-down" basis, according to a former Avaya Director of Operations, Global Solutions Sales and Support, and a former Avaya Senior Client Executive, both of whom explained that Defendant McGuire did not solicit any input from the persons

- 28 -

who had the quotas imposed upon them. A "top-down" forecast refers to the fact that the forecast is dictated from "top" executives (McGuire) "down" to the sales representatives without regard for whether the company can actually achieve such results. According to both of these former Avaya employees, McGuire's quotas were based upon the unreasonable financial projections Defendant McGuire made to investors, as opposed to reasonable assessments as to what was realistically attainable.

(b)     Defendants' then knew their statements to be without any basis because Avaya was then already experiencing substantial problems with its go-to-market marketing strategy, which had substantially interrupted and interfered with Avaya's sales to important "enterprise" accounts. For instance, according to a former Senior Client Executive with Avaya from 2001 until March 2004, and who handled executive accounts before being shifted over to middle-market sales as part of the "go-to-market" strategy ("Confidential Witness Number 5" or "CWN5"), Avaya began implementing the "go-to-market" strategy in October 2003 by reassigning Client Executives from bigger "enterprise" accounts to mid-market accounts. In October 2003, it became apparent to CWN5 that the go-to-market strategy would cause – at the very least – a substantial loss of business already in the pipeline. As explained by CWN5, by shifting Client Executives off of their accounts, many customers lost confidence and trust in Avaya and certain large sales were lost. CWN5 noted he personally lost approximately $7 million in sales, including lucrative contracts with ACS in Utica, New York for $1.5 million and a $750,000 deal with Alcoa. These and

- 29 -

other similar losses experienced in the months after the go-to-market strategy was implemented in October 2003 were to have a substantial impact on Avaya's financial results during the Class Period. According to CWN5, Avaya's sales cycle for enterprise accounts was anywhere from six months to one and a half years. Facts attributed to CWN5 were personally known to him.

(c) Contrary to the publicly positive spin defendants put on Avaya's financial results and future projections, internally defendants were taking drastic steps to reduce costs in an effort to continue to meet the expectations the defendants had fostered in the marketplace. For instance, Avaya fired a number of key employees at the end of September 2004 only days before those employees would have been guaranteed their bonus payments for the year (a fact corroborated by several former employees of the Company). According to CWN3, employees fired in September 2004 were told that they were fired specifically *because the Company's business was not doing well*.

(d) Avaya's operating margin, revenue and earnings goals were all unreasonable and without any basis in fact given the pricing pressures then being faced by Avaya, as well as the Company's loss of business it was then experiencing for over a year as a result of the go-to-market strategy it had implemented back in 2003.

53. On November 18, 2004, Avaya announced that it had completed its acquisition of Tenovis.

54.     Also on November 18, 2004, Avaya announced it would redeem all of Avaya's outstanding Liquid Yield Option Notes due 2021 ("LYONs"), which notes amounted to a principal amount of approximately $548.7 million. Pursuant to the terms of these notes, holders had the choice of redeeming notes with a face value of $1,000 at maturity for a present payment in cash of $545.67, or alternatively the LYONs were convertible into 37.4437 shares of Avaya common stock per $1,000 principal amount at maturity. LYONs holders were given until December 20, 2004 to choose which method of redemption, cash or stock, they preferred.

55.     LYONs holders could redeem their notes for approximately $627 in Avaya shares on November 18, when the stock traded at approximately $16.50, or the $545.67 cash payment called for by the Notes. For obvious reasons, nearly all of the LYONs were converted into Avaya common stock. Only $61,000 in LYONs (of the face amount equaling over $500 million) were not redeemed for Avaya common stock. So long as defendants could keep Avaya shares trading at over $14.57, it would make sense for all of the holders of the LYONs to redeem their notes for Avaya common stock and not cash – which fact strongly motivated defendants to artificially inflate (and maintain) the price of Avaya's common stock.

56.     On December 16, 2004, Avaya's Compensation Committee of the Board of Directors approved a special incentive plan to promote the successful integration of Tenovis by which Avaya's senior management involved in the integration of and

management of Tenovis (including defendants) would be rewarded based upon the

financial results achieved by Tenovis in 2005.

57.     On January 25, 2005, Avaya released its financial and operational results

for the first quarter of fiscal 2005.  The press release stated, in pertinent part, as

follows:

> "We continue to improve our profitability with operating income
> rising 70 percent year-over-year," said Don Peterson, chairman and
> CEO, Avaya.  "We completed the Tenovis acquisition, shipped our five
> millionth IP telephony line and substantially reduced our debt. ***Our first
> quarter results position us to meet our goals for the year*.**"
>
> Avaya said its fiscal 2005 goals are to increase revenues between
> 25 and 27 percent compared to fiscal 2004 revenues of $4.055 billion,
> grow operating income by 40 percent compared to $311 million in fiscal
> 2004 and raise annualized operating margin to between 8.5 and 9 percent
> compared to 7.7 percent last year.

(Footnote omitted.)

58.     Avaya's first quarter results were in line with, or better than, analysts'

expectations.  For instance, Avaya reported Earnings Per Share ("EPS") of 20 cents,

beating consensus EPS estimates of 18 cents.

59.     After defendants issued the above press release to the market, they held a

conference call for analysts and investors in which the defendants made the following

false statements:

> **Peterson**:    [W]e're moving quickly following the earlier than expected
> closing of the Tenovis acquisition to integrate it into our business and
> realize its potential, and we continue to improve our financial
> strength . . . .

*     *     *

- 32 -

**Peterson**:    *[W]e believe we can and will do better in the U.S. as we move through the year.*

*    *    *

**Peterson**:    So as you can see we made substantial progress toward our goals during the quarter.  And while we do have some work ahead of us, *we are confident of our ability to execute against and achieve our plan for the year*.

*    *    *

**McGuire**:    The end result, as Don mentioned, is that *we are on track to meet our goals for the year*, even though there were some aspects to our performance that are below our expectations and that we are working on to improve.

*    *    *

**McGuire**:    As Don and I have both mentioned, we continue to focus on achieving our annual goals for the year and remain confident in our ability to do so.  Economic conditions in our key markets remain largely favorable. . . . *Our business is performing largely as expected*.

60.    Defendants not only told investors that Avaya was then on track to meet its financial targets, but defendants *promised* to obtain these results and defendants specifically told investors they would update the public in the event the Company's condition should change:

**Peterson**:    Yes, I would just maybe take a moment and reiterate again what we have said we plan to do for the year.  Growing revenue 25 to 27 percent.  Increasing operating income by 40 percent.  Increasing our annualized margin to the 8.5 to 9 percent range, which would put us on the trajectory to go beyond that in 2006.

**Peterson**:    *All of those things are on track.*  We do have a business that is somewhat more seasonal in its pattern than some of our data industry brethren, and this is a fall-over or holdover of the telecom business even though these things are merging in IP telephony.  But we

- 33 -

think that we had a solid quarter that is positioning us well to go on through the rest of the year and achieve those goals.

**Peterson**:   *We will obviously report to you as we make that progress at the very least in our quarterly results.  <u>And if there is something particularly important, we will come to you before that, but otherwise assume that we are on the track and going to make that – going to deliver on those promises as the year goes on</u>*.

61.   In addition to the press release and conference call, defendants' statements to numerous analysts covering Avaya (both in the conference call and in follow-up meetings afterwards) were subsequently published to investors.   For instance, on January 26, 2005 JP Morgan issued a research report titled:  "Margin Story Intact Despite Confusing Qtr" that maintained JP Morgan's "Overweight" rating and stated "the core AV operating margin story remains alive and well as core AV expanded margins to 10.3% in Q1 from 10.0% last quarter."  JP Morgan exclaimed: "Core AV operating margins were strong."  And, JP Morgan reported that "given management's positive tone on the conf[erence] call, not much has changed regarding the outlook."

62.   Also on January 25, 2005, after defendants' analyst conference call, Citigroup issued an analyst research report stating: "We think that Avaya reported a quarter that could be characterized as solid . . . . Furthermore, it seems to have hit the ground running relative to integrating the Tenovis acquisition."

63.   On January 26, 2005 Legg Mason issued a favorable analyst research report on Avaya stating:

- 34 -

Avaya reported its 1Q05 results last night with revenues coming in at $1.15 billion, higher than our expectation of $1.08 billion. The Street average estimate for 4Q revenues was $1.12 billion. On a sequential basis, revenues were up 6.5% from $1.08 billion in the prior quarter. GAAP EPS for the quarter were $0.07. On a normalized basis, 1Q05 EPS were in line with the Street, and our estimate of $0.18.

\*       \*       \*

***The company sees momentum building in the enterprise telephony market.*** Given its position as a leader in this market ***management is optimistic it will achieve its goals of growing operating income by 40% and realizing an operating margin of between 8.5% and 9.9% in 2005.***

64.     Defendants' statements in the press release in ¶¶57-58, and to analysts following the press release as set forth in ¶¶59-63, were each materially false and misleading when made because defendants failed to disclose and/or misrepresented the facts set forth in ¶¶31-36, 46-47, 52 and the following adverse facts, which were known to defendants, or recklessly disregarded by them, at all relevant times:

(a)     Avaya was not then "on track" to achieve its publicly announced financial targets, nor was there any basis for claiming Avaya would do better in the U.S. as the year progressed. Rather, defendants knew at the time of making their statements that Avaya was experiencing substantial disruption in its sales channels as a result of the go-to-market program. Because of the long lead time for finalizing sales with Avaya's premier clients, ranging from 6 months to a year and a half, defendants were keenly aware that the Company had been losing substantial business from these disruptions.

(b)     Avaya's margins were shrinking in the face of stiff competition, which had long-term negative consequences for the Company that it failed to disclose. As detailed above, according to a former Avaya employee (CWN4), during the months leading up to and during the Class Period Avaya was being forced by customers to compete by lowering prices. Because of the long negotiating process for these transactions, defendants knew Avaya was being forced into making huge pricing concessions well in advance of when those contracts appeared on Avaya's financial statements. Indeed, in many instances Avaya was granting price concessions in excess of 30-40% in order to win business – a fact later admitted by defendant McGuire *after* the Class Period.

65.     During the month of February, defendants met with analysts on several occasions to assure them that Avaya's integration of Tenovis was proceeding according to plan and that the Company's business was on track to achieve the financial goals defendants had set for the Company. In the first week of February, analysts with Kaufman Bros. Equity Research met with defendants and reported to the public that Kaufman Bros. continued to believe Avaya was on target.

66.     On February 21, 2005, Avaya held a product briefing for investors and analysts at its corporate headquarters. According to a research report issued by Prudential Equity Group, LLC: "The company discussed the integration of the Tenovis products and channel with the core Avaya business, highlighting the segmentation opportunities provided by both lines." That same week, defendant

- 36 -

McGuire met with investors in New York and Boston to sell them on Avaya's business and update them on the integration of Tenovis. In all these meetings, defendants asserted that the Tenovis integration was showing substantial "progress" and that Avaya's business was performing as expected.

67.    In fact, the Tenovis integration was not progressing smoothly as defendants were telling the public. Less than two months later, the defendants would admit that Avaya missed earnings estimates because the integration process was requiring "more significant managerial resources than anticipated" and that Avaya's IP staff had been forced "to shift their focus away from improving [Avaya's] business and sales processes in the U.S." Moreover, defendants admitted the integration was requiring substantial "senior management focus" that was causing the Company to miss other opportunities. *See* ¶87(c). Avaya's integration problems, as set forth previously in ¶¶31-36 and as admitted to by defendants shortly after the Class Period, by their very nature manifest themselves long before defendants admitted to their existence after the Class Period. Defendants' statements to investors assuring them the acquisition integration was progressing smoothly were false.

68.    On February 24, 2005, Avaya announced that it had completed "a new $400 million five-year unsecured revolving credit facility. The new facility replace[d] Avaya's existing $250 million secured credit facility, which would have expired in September 2005. The new facility was over-subscribed as commitments exceeded $600 million." The press release continued, in pertinent part, as follows:

- 37 -

"We appreciate the confidence and support from our banking partners as this facility provides flexibility for Avaya to continue executing its growth strategy," said Garry K. McGuire, Chief Financial Officer and senior vice president, Corporate Development, Avaya. "The de-leveraging of our long-term debt, this new credit facility, and the removal of the bank group's security interest are all key steps in Avaya's long-stated financial strategy to restore its investment grade rating."

69.     On March 2, 2005, McGuire (on behalf of Avaya and with the knowledge of defendant Peterson) made a presentation to investors and research analysts at the Fourth Annual JMP Securities Research Conference. As required, a copy of the presentation was filed with the SEC for all investors to review, which filing was signed by defendant McGuire. As part of the presentation, Avaya *increased* its revenue estimates for the year. Whereas prior to March 2, 2005 Avaya had told the public it expected total revenue to grow in 2005 by approximately 25%-27%, during its presentation Avaya increased its estimate to *at least* 28%.

70.     In addition to increasing Avaya's revenue expectations, on March 2 defendants reaffirmed that gross margin in 2005 would show a "Solid improvement for the year." Defendants also reaffirmed Avaya's operating income would show "Growth of approximately 40%" and that operating margin would be 8.5% to 9%.

71.     Defendants reassured the market that the Company was "Focused on Achieving Our Annual Goals" and was then experiencing "[b]uilding momentum in key areas that drive our performance and ability to build value."

72.     Similarly, defendants again misled the public about the Company's integration of Tenovis. Defendant McGuire told the assembled analysts and others

- 38 -

joining via webcast, "we are moving quickly on the Tenovis integration. We understand the importance of getting that in and delivering on the guidance that we've given and we're very focused on that. . . ."

73.    Defendant McGuire also misrepresented the pricing pressure Avaya was then experiencing in response to a question from the JP Morgan analyst, Sam Wilson, concerned about the effect of pricing pressure from Cisco:

Q:    One of the questions I [often] get is the dreaded beast Cisco is going to dive bomb pricing tomorrow just to gain market share. How do you compete head to head with these guys? I know you sell the migration story which seems to work exceptionally well because you're the number one in the market share right now. How are you dealing with competing against this kind of big bad beast?

**McGuire**:    A:    [They] are big bad beasts in the routing and switching area. Let's not be confused by that to begin with. They're still in their infancy in the IP telephony area. A couple of things. [They] are a good competitor I think to have relative to the pricing environment. If you look at where they are. I mean, they're – their market value has been dropping over the last year or so because they haven't had the kind of revenue growth that they need to sustain the multiples that were in the stock. And what has kept them up is the high gross margins in the company. And they've had a little bit of deterioration in that already this year. They're getting attacked, I think, from people like Hauwei in their traditional market, putting pressure on where their gross margin really come. The IP telephony margins are 10 points lower than their company wide margins. So if they start a price war in IP telephony, they're only going to further exacerbate the pressure they've got on gross margins. So in that regard, I kind of view them as a nice competitor to have because that's a problem they've got to live with.

74.    McGuire's comments at the Fourth Annual JMP Securities Research Conference were material, and widely published by research analysts covering the conference. For example, on March 2, 2005 Morgan Keegan issued an analyst

- 39 -

research report "Adjusting Estimates Based on Management's Comments." The report noted:

> Avaya management gave a presentation at an investor conference this morning. The discussion included some incremental details on the company's recent Tenovis acquisition.
>
> First, management mentioned that it expected revenue growth to be 28% or more this year vs. previous expectations of 25%-27%, which was given at their October analyst conference.

75.     On the next day, March 3, 2005 JP Morgan issued a favorable analyst report "Upping Estimates on New Rev[enue] Guidance." JP Morgan noted:

- Yesterday at a competitor conference in San Francisco, Avaya increased its fiscal 2005 revenue guidance to "growth of at least 28%" from "growth of approximately 25 to 27%." This adds roughly $90-$122M in incremental revenue to F05.

                    *       *       *

**Investment Thesis**

*Following the increased guidance, we believe the company has removed one of the largest bear stories on the stock – that the core business is not growing as much as we all had expected.*

                    *       *       *

*Avaya's revised revenue guidance renews our confidence in the '05 story . . . .*

76.     On March 7, 2005, McGuire (on behalf of Avaya and with the full knowledge of Peterson) made a similar presentation to investors and research analysts at the Morgan Stanley Semiconductor and Systems Conference. McGuire re-affirmed

that Avaya would accomplish "*at least* 28% revenue growth" on a year-over-year basis.

77.    Defendant McGuire was again asked if Avaya was witnessing "Any significant changes one way or the other in the pricing environment?"   Again, McGuire downplayed investors' concerns by responding that the market had been "fairly stable with just modest declines over the last 12 months."

78.    On March 10, 2005, McGuire (on behalf of Avaya) made a presentation to investors and research analysts at the Deutsche Bank Securities Inc. IT Hardware Conference.  At the conference, McGuire falsely stated that "Pricing has been fairly steady for the last couple of years. . . . I don't' see any reason that that would change significantly."

79.    The statements referenced above in ¶¶69-78 were each materially false and misleading when made because defendants failed to disclose and/or misrepresented the facts previously set forth in ¶¶31-36, 46-47, 52, 64, 67 and the following adverse facts, which were known to defendants, or recklessly disregarded by them, at all relevant times:

        (a)    Avaya was not then "experiencing building momentum" and was not then seeing "solid" business and financial results.  Similarly, defendants had no basis for claiming to be on track to meet projections and increasing revenue guidance.

        (b)    Avaya was in fact experiencing severe pricing pressure from its rivals, including Cisco, which was driving down Avaya's margins.  An independent

Avaya sales manager (a person who sells Avaya product but is not employed by the Company) ("Confidential Witness Number 6" or "CWN6") confirmed that Avaya was in March 2005 cutting prices on some of its midrange systems – contrary to defendants' statements.  Most notably, according to CWN6, Cisco was attacking Avaya on price and hurting Avaya in the small and midsized business markets. Further, according to CWN 6, the Company was showing increased interest in his sales projections in March and urging him to close deals before the quarter's end because, according to CWN6, it looked like Avaya could not meet its earnings forecasts.

## THE "TRUTH" BEGINS TO SLOWLY LEAK OUT

80.     Contemporaneous with and shortly after defendants falsely told investors that Avaya was on track to meet or exceed its earnings, revenue and margin projections, and that Avaya was not experiencing pricing pressure, some market participants began to question the strength of Avaya's business.

81.     Notwithstanding defendants' March 2, 2005 bullish increase in Avaya's forecasted FY2005 revenue growth to 28%, as alleged in ¶¶69-75, on March 4, 2005, Gina Sokolow and Benjamin Kadlec of The Buckingham Research Group noted that their check of Avaya's sales "channel" indicated Avaya was experiencing "weak" spending for its products.  Similarly, these analysts reported that Avaya was then busily firing sales staff in order to cut costs, which the analysts hypothesized would "negatively effect growth."  Nonetheless, as previously alleged at ¶¶76-77, defendants

again reaffirmed their 28% revenue growth forecast just three days later, on March 7, 2005.

82.    Defendants followed up with their March 10, 2005 statement that Avaya's pricing was remaining steady, as alleged in ¶78.

83.    Subsequently, on Monday March 21, 2005, Lehman Brothers' equity analyst Jiong Shao issued a report on Avaya speculating that Avaya's business was performing weaker than had been expected.  This report caused Avaya's shares to drop by seven percent on the day.  Shao noted that *his* check's of Avaya's direct sales channel indicated sales "appear to be below plan at this point" in the quarter.  Shao also noted *his* checks revealed that Avaya had been instituting huge 30% to 40% discounts on its mid-range products since the beginning of March in an effort to offset weakness in March sales.

84.    Similarly, on March 22, 2005, Citigroup Smith Barney issued an analyst research report commenting on Avaya's stock price decline in the face of some speculation that Avaya was experiencing "demand weakness."  "We think the recent pullback in the shares significantly improves the risk-reward tradeoff for investors. We think that concerns over demand weakness in the enterprise for AV have been overblown."  Then, Citigroup's analyst repeated several times that it would be inconceivable for the defendants to have increased guidance so recently if the Company was in fact experiencing sales weaknesses:

- ***We also remind investors that the company updated guidance less than one month ago. If persistent demand weakness was an issue, we believe mgmt would have addressed the issue at that time***.

*    *    *

- ***We note that the company updated guidance less than a month ago. Had there been enough persistent demand weakness to merit concern of missing estimates, we believe that company would have reflected that in its commentary***.

*    *    *

[T]he company only reset guidance less than a month ago in early March. If demand had been as persistently weak as the bears suggest, ***it is hard to believe that management would not have provided that color in revising their forecast***.

85.    While the foregoing reports indicate that some analysts began speculating about the strength of Avaya's business, beginning in early March 2005 through the end of the Class Period on April 19, 2005, none of these reports alleged that defendants had lied nor indicated how bad the problems really were at Avaya.

**THE RESULTS AND AFTERMATH OF DEFENDANTS' FRAUD**

86.    On April 19, 2005, Avaya shocked the investing public when it released its financial and operational results for the second quarter of fiscal 2005 and reported revenues and earnings far short of previous guidance and analyst expectations of earnings of $0.17 a share on revenue of $1.29 billion. Avaya reported earnings of only $0.07 a share – missing the expectation defendants fostered in the market by 60% (and down from $0.27 a share the prior year). The press release stated, in pertinent part, as follows:

- 44 -

Avaya Inc., a leading global provider of business communications software, systems and services, today reported income from continuing operations of $36 million or seven cents per diluted share in the second fiscal quarter of 2005. These results include six cents of dilution related to the results of operations from the Tenovis acquisition. . . .

In the same quarter last year the company reported income from continuing operations of $103 million or 22 cents per diluted share. Included in the $103 million were one-time items that had a net favorable impact of $63 million or 13 cents per diluted share. . . .

Avaya's second fiscal quarter 2005 revenues increased 21 percent to $1.222 billion compared to revenue of $1.006 billion in the second fiscal quarter of 2004. The revenue increase reflected the impact of recent acquisitions and revenue growth outside of the United States. The company said U.S. product and services revenues declined year-over-year. Avaya's overall IP product sales rose nearly 30 percent year-over-year. Outside of the United States, IP product sales rose more than 50 percent compared to the year ago period.

"Although our performance this quarter was not up to our expectations, we're confident in the opportunity in IP telephony and our competitive advantage," said Don Peterson, chairman and CEO, Avaya. "Three key factors affected our overall performance: our implementation of a new go-to-market model in the United States, which has created some disruption affecting U. S. sales, the impact of the Tenovis integration and early signs of potential softness in the U.S. technology market. We will take actions to manage our business, including a tighter focus on cost control, to meet these challenges, improve our performance in the United States and build on our strength in other markets."

\*     \*     \*

**Outlook For The Year**

Avaya said it expects its performance in the second half will improve with sequential increases in the third fiscal quarter in revenues and profitability and with revenue growth and profitability accelerating in the fourth fiscal quarter. ***However, the company believes it will not meet its previously stated goals for growing revenues, operating income and operating margin in fiscal 2005.***

- 45 -

87.    On the same day, defendants Peterson and McGuire held a conference call discussing the Company's quarterly results, wherein they made several startling admissions:

(a)    Peterson and McGuire reiterated that Avaya would not meet its financial goals for the year as a result of its poor performance in the quarter – which defendants inexplicably asserted were not apparent until just prior to the end of the Class Period.  McGuire noted:

> Our topline performance was clearly not what we expected.  March revenues did not materialize as expected and this had a direct impact on earnings.  It also impacted our ability to achieve the growth rate we needed in the second half of the year to meet our fiscal '05 targets.  As a result we will miss the goals that we had previously set for this year, revenue growth of 28%, 40% growth in operating income and an operating margin of 8.5 to 9%.

(b)    Peterson and McGuire admitted that the go-to-market strategy had substantially and negatively affected Avaya's financial results in the quarter.  Peterson stated: "The implementation of our new go-to-market strategy which we discussed at our Investment Community Meeting is taking longer and has been somewhat more disruptive than we had envisioned. . . .  [I]t has in the short-term negatively affected our direct sales in the U.S."

(c)    Peterson and McGuire also admitted that Avaya's management was experiencing significant problems integrating Tenovis.  Trying to explain why management was unable to deal with the ill-effects of the go-to-market strategy, Peterson explained: "This issue [concerning the go-to-market strategy] came during a

- 46 -

time in which we were devoting significant management attention and resources to the

Tenovis integration. . . . [F]rom an operational standpoint the integration effort was

and remains substantial. ***And requires more significant managerial resources than***

***anticipated.***"  Defendant McGuire expanded on this, stating:

> Our Tenovis team did not have time to identify, address, and fix any
> problems that arose before the closing. It required more of our IP staff to
> shift their focus away from improving our business and sales processes
> in the U.S. and it required more work to be done manually which is
> inefficient. And it required more senior management focus. So frankly,
> there has been an opportunity cost to the integration that we did not
> perceive.

(d)     Avaya's operating margin for the quarter was only 4.3% – far short

of the 8.5 to 9% percent that defendants had told the market it was on pace to achieve.

Indeed, Avaya's operating margin for the quarter had not grown at all but had dropped

significantly from the 7.7% operating margin reported in the prior quarter.  A large

portion of the decline in operating margin was due to the Tenovis acquisition – which

had experienced a ***negative*** operating margin of 11.8 percent in the quarter ending

March 31.

(e)     Defendants were clear to explain that the Company's horrible

results were not the result of outside macroeconomic factors, but were specific to

Avaya. As defendant McGuire stated: "[T]he go-to-market we think had a significant

impact and then the channel had a significant impact, much more – the least – much

more than at least we can identify right now than the macroecomic issues might have

had." As clarified by defendant Peterson: "I would amplify that by just saying ***well***

- 47 -

*over a majority of this shortfall I would attribute more to issues related to us than issues related to the market*."

88.    The investing public's reaction was swift and negative.  One analyst at J.P. Morgan called the results "horrid" and cut its rating on the stock to "neutral" from "overweight."  Avaya's stock price fell more than 25% on April 20, 2005, the single biggest loser on the NYSE, on extremely heavy trading volume.  Avaya's stock price has never recovered, never reaching its Class Period highs again.

89.    JP Morgan's analyst research report issued on April 20, 2005 elaborated on Avaya's woes, noting "Avaya reported a truly horrid quarter" with earnings missing estimates by nearly 50% and revealing a questionable business model that was both "murky" and "opaque."  JP Morgan went on to note that it was "*baffled* by AV's recent operational issues with its channel and U.S. services business, and by the wild fluctuations in Avaya's business from quarter to quarter."  Further, JP Morgan opined:  "*We also find the fact that management could not foresee the downturn in US revenues as late as early March when they upped their own company guidance to 28%+ as particularly disturbing. . . .*"  Indeed, JP Morgan noted it "*is astonishing to us that management increased annual revenue guidance on March 3rd, just to miss it 46 days later*."  Finally, JP Morgan was astonished by defendants' acknowledgement that the Tenovis integration was a primary cause of Avaya's horrid quarter.  "Management *flat out admitted* that unanticipated complications in the

Tenovis integration process were one of the reasons that it ran into so many operational issues in the U.S."

90.     Thomas Weisel Partners issued an analyst report on the "2Q debacle" noting that "the organic Avaya business was much weaker than [its] expectations" and lowering "estimates based on the disappointing results and weaker fundamental outlook." Thomas Weisel Partners cut its full year EPS estimates from $0.21 to $0.13 and similarly reduced its expectations concerning other financial metrics. Moreover, Thomas Weisel Partners stated the looming heavy discount on Avaya's stock price when it re-opened in the morning would be "warranted given the weak organic growth rate, Tenovis integration issues, and execution problems related to the current direct/indirect channel strategy."

91.     On April 20, 2005, Legg Masson issued an analyst report stating:

> Avaya reported revenues and earnings last night for F2Q05 that were well shy of the Street and our expectations. Revenues were $1.22 billion, $100 million less than our $1.32 billion forecast, and EPS were $0.07, $0.11 short of our $0.18 forecast. Weak product revenue, particularly in the U.S. market, which management attributed more to Avaya-specific issues than general enterprise market softness, was the principal culprit.

92.     On April 20, 2005, Kaufman Bros. Equity Research issued an analyst report on Avaya acknowledging that "Avaya's management needs to regain credibility with investors" and subsequently lowered its forecasts for the Company by substantial amounts.