<u>**NOT FOR PUBLICATION**</u>

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| HOWARD CHARATZ, et al., | : | CIVIL ACTION NO. 05-2319 (MLC) |
|  | : |  |
| Plaintiffs, | : | **MEMORANDUM OPINION** |
|  | : |  |
| v. | : |  |
|  | : |  |
| AVAYA, INC., et al., | : |  |
|  | : |  |
| Defendants. | : |  |

<u>**COOPER, District Judge**</u>

Plaintiffs commenced this action against defendant Avaya, Inc. ("Avaya"), defendant Donald K. Peterson ("Peterson"), and defendant Garry K. McGuire ("McGuire") (collectively, "defendants"), on behalf of all those that purchased Avaya's publicly traded securities between October 5, 2004 and April 19, 2005 (the "class period"). (Compl., at ¶ 1; Pls. Br., at 1.) Plaintiffs allege that defendants violated certain provisions of the Securities Exchange Act of 1934, 15 U.S.C. § ("Section") 78 <u>et seq.</u>, and Securities Exchange Commission Rule 10b-5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5. (<u>Id.</u>) Defendants move to dismiss the complaint pursuant to Federal Rule of Civil Procedure ("Rule") 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), Section 78u-4 <u>et seq.</u> (Dkt. entry no. 31.) For the reasons stated herein, the Court will grant the motion.

**BACKGROUND**

Avaya sells telecommunications equipment, applications and services to businesses, government agencies, and other organizations. (Compl., at ¶ 2.)  At all times relevant to the complaint, Peterson was Avaya's Chief Executive Officer and Chairman of the Board of Directors, and McGuire was Avaya's Chief Financial Officer and Senior Vice President of Corporate Development. (Id. at ¶ 22(a)-(b); Defs. Br., at 5.)  Peterson and McGuire were privy to confidential and proprietary information concerning Avaya's operations, finances, financial condition, and business prospects. (Compl., at ¶ 23.)

The class period relevant to this action began on October 5, 2004, when Avaya announced that it had reached an agreement to acquire Tenovis GmbH & Co. KG ("Tenovis"), a German telecommunications company, for $635 million in cash and assumed debt. (Id. at ¶ 28; Defs. Br., at 1, 5.)  Avaya's press release explained that Avaya and Tenovis "have complementary businesses and strategies including a common understanding of the unique communications needs of the enterprise customer." (Compl., at ¶ 28.)  Although Avaya predicted that the acquisition would be accretive by $0.07 per share in its 2006 fiscal year, it cautioned that "[e]xcluding non-recurring costs and start-up expenses of $0.05 per share, the acquisition is expected to be dilutive by $0.03 per share in fiscal year 2005." (Id.; Defs.

2

Br., at 5.)  Following the press release, Avaya held a conference
call for analysts and investors.  (Compl., at ¶ 29).  During the
call, McGuire made a number of statements describing the Tenovis
acquisition, including the following:

> In addition to being an excellent fit, [Tenovis is]
> also a strong operational fit. . . .  We think this is
> an important consideration because our complimentary
> approaches will enable us to more efficiently mitigate
> integration risks, because it will also enable us to
> more effectively capture and maximize opportunities for
> growth.  We believe these growth and value creation
> opportunities are substantial.
>
> [Tenovis is] an excellent strategic fit that makes us a
> formidable player in the largest region in the world
> for enterprise telephony.

(Id.)  Peterson also made several statements discussing the
acquisition during that conference call, including the following:

> Let me also say that we will also continue to maintain
> our focus on our current business.  We have a process
> and a plan in place to minimize distractions.  This
> includes forming a dedicated separate team to handle
> the integration process.
>
> The complimentary nature of Tenovis' business strategy
> and profile, as well as steps we are taking to handle
> the integration, will make for a smoother transition.
> It will also enable [us to] move quickly to capture
> value creation opportunity.

(Id.)

Avaya released its financial and operational results for the
fourth quarter of fiscal year 2004 (ending September 30, 2004) on
October 26, 2004.  (Id. at ¶ 37.)  The press release stated,
"Avaya's results this quarter cap a year of substantial

3

accomplishments and progress." (<u>Id.</u>)  It also noted that Avaya

had signed a definitive agreement to acquire Tenovis, and

explained that after the acquisition was completed, Avaya

expected its European revenue to increase from 12 percent to 30

percent and "Tenovis [would] add about one billion dollars to its

annual revenue." (<u>Id.</u>)  During a conference call following the

October 26, 2004 press release, Peterson made a number of

statements describing the Tenovis acquisition, including the

following:

> As you can see from the results we issued earlier
> today, 2004 has played out largely according to our
> expectations.
>
> Clearly we are enjoying significant momentum in the
> marketplace, and we are converting that momentum into
> increased profitability and financial strength.
> Underlying this momentum are our Company's strategic
> advantages.
>
> [Avaya and Tenovis] have complementary businesses and
> strategies which make Tenovis an excellent strategic
> fit and operational fit as well.
>
> The end result is that today we are a stronger more
> competitive organization that enjoyed significant
> potential [sic] to further build shareholder value.
>
> I'd say pricing as a general comment is not different
> than what it has been.  There continues to be, you
> know, pressure in the market, it's a very competitive
> marketplace but I wouldn't say there's anything
> particularly noteworthy in the trend line one way or
> the other.

(<u>Id.</u> at ¶¶ 38-39.)

Avaya issued another press release on October 29, 2004,

predicting that its operating margins for fiscal year 2005 would

be "between 8.5 percent and 9 percent on fiscal 2005 revenues
that are expected to grow by between 25 percent to 27 percent
compared to fiscal year 2004." (Id. at ¶ 48; Defs. Br., at 6.)
However, Avaya cautioned investors that these numbers could
differ materially due to certain risk factors, including "the
ability to successfully integrate [acquired companies]", "price
and product competition", and "customer demand for products and
services." (Defs. Br., at 6)  The press release referred
potential investors to Avaya's filings with the Securities
Exchange Commission ("SEC") for additional discussion of the risk
factors that could cause its actual results to materially differ
from the predictions. (Id.)  Avaya's Quarterly Report on Form
10-Q, which it had filed with the SEC on August 12, 2004, warned
of other risk factors, such as "intense" price and product
competition and costs and disruptions caused by the integration
of acquired companies. (Id.)

Avaya hosted the 2004 Avaya Financial Analyst conference in
late October 2004, during which Peterson and McGuire spoke at
length about Avaya's business and financial condition. (Compl.,
at ¶ 49.)  Following the conference, on November 1, 2004,
Kauffman Bros. Equity Research issued a report stating, "we
believe Avaya has the right strategy for the marketplace and can
deliver annual EPS growth of 23%-27% over the next several years.
Due to our increased confidence in Avaya's outlook and its

5

ability to achieve robust EPS growth, we are raising our price target [to] $18 from $16."  (Id. at 50.)

Avaya issued a press release announcing its results for the first quarter of fiscal year 2005 on January 25, 2005.  (Id. at ¶ 57; Defs. Br., at 7.)  Avaya stated, "our first quarter results position us to meet our goals for the next year."  (Compl., at ¶ 57.)  It also described Avaya's results as "in line with, or better than analysts' expectation."  (Id. at ¶ 58.)  For example, Avaya beat consensus earnings per share estimates of $0.18 with reported earnings per share of $0.20.  (Id.)  Avaya reiterated its earlier predictions for fiscal year 2005, such as increasing revenues between 25 percent and 27 percent and raising the annualized operating margin to between 8.5 percent and 9 percent, and also predicted that it would increase its operating income by 40 percent.  (Id. at ¶ 57; Defs. Br., at 7.)  However, Avaya noted that sales in the United States had been flat, in part because of a change in the company's "go-to-market" strategy, and the Tenovis acquisition would likely be more dilutive to earnings per share for fiscal year 2005 than initially expected.  (Defs. Br., at 7.)  During a conference call with investors and analysts held in connection with the January 25, 2005 press release, Peterson made many statements discussing Avaya's goals for fiscal year 2005, including the following:

> We believe we can and will do better in the U.S. as we move through the year.

So as you can see we made substantial progress toward
our goals during the quarter.  And while we do have
some work ahead of us, we are confident of our ability
to execute against and achieve our plan for the year.
All of those things are on track [-growing revenue,
increasing operating income, and increasing our
annualized margin].

We will obviously report to you as we make that
progress at the very least in our quarterly results.
And if there is something particularly important, we
will come to you before that, but otherwise assume that
we are on the track and going to make that - going to
deliver on those promises as the year goes on.

(Compl., at ¶¶ 59-60.)  Moreover, McGuire made the following

statements:

The end result . . . is that we are on track to meet
our goals for the year, even though there were some
aspects to our performance that are below our
expectations and that we are working on to improve.

[W]e continue to focus on achieving our annual goals
for the year and remain confident in our ability to do
so.  Economic conditions in our key markets remain
largely favorable. . . .  Our business is performing
largely as expected.

(Id. at ¶ 59.)  Avaya again cautioned investors that actual

results could differ materially from its projections for fiscal

year 2005 due to risks associated with price competition,

customer demand, and Avaya's ability to effectively integrate

acquired companies such as Tenovis.  (Defs.' Br., at 7.)  The

press release and corresponding conference call referred

investors to Avaya's recent filings with the SEC for a more

detailed discussion of risk factors that could cause Avaya's 2005

results to be materially different than its projections.  (Id.)

7

Avaya's Annual Report on Form 10-K, for example, discussed the risk factors at length.  (Id.)

McGuire reiterated Avaya's financial predictions for fiscal year 2005 at a presentation on March 2, 2005.  (Id.)  McGuire increased Avaya's revenue growth projection to 28 percent because the Tenovis acquisition had closed several weeks earlier than expected.  (Id.; Compl., at ¶ 69.)  Similarly, McGuire assured the public that Avaya was focused on achieving its goals for the year and was building momentum that drives its ability to perform and add value.  (Compl., at ¶ 71.)  McGuire repeated Avaya's earlier assertion that the Tenovis acquisition would likely dilute earnings for the fiscal year 2005 and referred investors to Avaya's recent SEC filings for a discussion of risk factors that could cause Avaya's actual results to differ from its projections for fiscal year 2005.  (Defs. Br., at 7-8.)  Avaya's Quarterly Report on Form 10-Q, which it filed with the SEC on February 8, 2005, discussed such factors at length.  (Id. at 8.)  At both this presentation and subsequent presentations, McGuire addressed concerns about the pricing environment by stating, for example, that the market had remained relatively steady, the market had only modest declines over the previous twelve months, and Avaya was not particularly troubled by its biggest competitor.  (Compl., at ¶¶ 73, 76-78.)

8

Avaya released its results for the second quarter of fiscal year 2005 on April 19, 2005. (Defs. Br., at 8.) Avaya reported a 21 percent increase in quarterly revenues and that the Tenovis acquisition had only diluted earnings by $0.06 per share, which was less than anticipated. (Id.) Further, due to the inclusion of Tenovis, Avaya's Europe/Middle East/Africa region had grown from 13 percent to 31 percent of total revenues. (Id.) Nevertheless, Avaya announced that it no longer believed it would reach its projections for the 2005 fiscal year with respect to revenue growth and operating margins. (Id.) In fact, revenue had only increased by 21 percent in the second quarter of 2005, not 25 to 27 percent as projected, and Avaya's operating margin was only 4.3 percent, a margin much less than the 8.5 to 9 percent predicted. (Compl., at ¶¶ 86-87.) Avaya explained that its performance was hindered by (1) its new "go-to-market" model in the United States taking longer and being more disruptive than expected, (2) the Tenovis acquisition and integration requiring more managerial resources than expected, and (3) early signs of softness in the United States technology market. (Id. at ¶ 87(b)-(c); Defs. Br., at 8.) Peterson explained that "well over a majority of this shortfall [he] would attribute more to issues related to [Avaya] than issues related to the market." (Compl. at ¶ 87(e).) Also, on a conference call with Merrill Lynch on April 28, 2005, McGuire responded to reports about Avaya giving

30 to 40 percent discounts to customers during the first quarter of 2005, stating, "[n]ow, I hear the noise that, yes, we were out with a 30% to 40% discount on a program in last quarter. . . . [I]t's not unusual. . . .  And quite frankly, a 30% to 40% discount is not out of the norm for any of these programs."  (Id. at ¶ 93.)  Due to its disappointing second quarter results, Avaya's stock price dropped from $10.69 per share on April 19, 2006 to $8.01 per share on April 20, 2005.  (Id. at ¶ 110; Defs. Br., at 8.)

## DISCUSSION

### I.   Legal Standards

#### A.   Rule 12(b)(6), Rule 9(b), and the PSLRA

A court may dismiss a complaint pursuant to Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6).  On a motion to dismiss a court generally must accept as true all of the factual allegations in the complaint, and must draw all reasonable inferences in favor of the plaintiffs.  Cal. Pub. Employees' Ret. Sys. v. Chubb Corp., 394 F.3d 126, 134 (3d Cir. 2004); Doe v. Delie, 257 F.3d 309, 313 (3d Cir. 2001).  However, a court need not credit bald assertions or legal conclusions alleged in the complaint.  Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906 (3d Cir. 1997).  "Dismissal of claims [on a motion to dismiss] is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts

10

in support of his claim upon which relief may be granted." Jakomas v. McFalls, 229 F.Supp.2d 412, 419 (W.D. Pa. 2002).

A securities fraud action, however, "requires more than mere reference to the conventional standard applicable to motions under Rule 12(b)(6)." C.W. Sommer & Co. v. Rockefeller (In re Rockefeller Ctr. Props., Inc.), 311 F.3d 198, 215 (3d Cir. 2002). Rather, the PSLRA and Rule 9(b) impose heightened pleading requirements that must be satisfied for a complaint sounding in securities fraud to survive a motion to dismiss.  See In re Advanta Corp. Sec. Litig., 180 F.3d 525, 531 (3d Cir. 1999).

Rule 9(b) states, "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b).  "This particularity requirement has been rigorously applied in securities fraud cases." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1417 (3d Cir. 1997).  Though Rule 9(b) does not require plaintiffs to plead every material detail of the fraud, it nevertheless "requires, at a minimum, that plaintiffs support their allegations of securities fraud with all of the essential factual background that would accompany the first paragraph of any newspaper story – that is, the who, what, when, where and how of the events at issue." Chubb Corp., 394 F.3d at 144; In re Rockefeller, 311 F.3d at 217 (internal quotations omitted).

11

Application of Rule 9(b) prior to discovery, however, "may permit sophisticated defrauders to successfully conceal the details of their fraud."   Shapiro v. UJB Fin. Corp., 964 F.2d 272, 284 (3d Cir. 1992) (internal quotations omitted). "Accordingly, the normally rigorous particularity rule has been relaxed somewhat where the factual information is peculiarly within the defendant's knowledge or control."   In re Burlington Coat Factory, 114 F.3d at 1418.

Plaintiffs alleging securities fraud must also comply with the heightened pleading requirements of the PSLRA.   Chubb Corp., 394 F.3d at 144.   The PSLRA requires plaintiffs to

> specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1).   This "particularity [requirement] extends that of Rule 9(b) and requires plaintiffs to set forth the details of allegedly fraudulent statements or omissions, including who was involved, where the events took place, when the events took place, and why any statements were misleading."   In re Rockefeller, 311 F.3d at 218.   Thus, the PSLRA imposes another layer of factual particularity on securities fraud claims.   Chubb Corp., 394 F.3d at 144.

The PSLRA also modifies the burden of pleading intent, or scienter, by requiring plaintiffs to "state with particularity

facts giving rise to a strong inference that the defendant acted
with the required state of mind." 15 U.S.C. § 78u-4(b)(2). To
establish the requisite strong inference that the defendant acted
with scienter, plaintiffs must allege facts that either (1) "show
that defendants had both motive and opportunity to commit fraud",
or (2) "constitute circumstantial evidence of conscious
misbehavior or recklessness". <u>In re Suprema Specialties, Inc.
Sec. Litig.</u>, 438 F.3d 256, 276 (3d Cir. 2006); <u>see also</u> <u>In re
Digital Is. Sec. Litig.</u>, 357 F.3d 322, 328-29 (3d Cir. 2004).
"Either way, plaintiffs must plead facts 'with particularity,'
and these facts must give rise to a 'strong inference' of a
knowing or reckless misstatement." <u>In re Digital Is.</u>, 357 F.3d
at 329-330 (noting that the PSLRA requires a "strong inference"
of scienter to survive a motion to dismiss; a reasonable
inference is insufficient).

A plaintiff's failure to meet the heightened pleading
requirements set forth in Rule 9(b) and the PSLRA justifies
dismissal of the complaint apart from Rule 12(b)(6) dismissal.
<u>Chubb Corp.</u>, 394 F.3d at 145. Accordingly, a modified Rule
12(b)(6) analysis is employed in the securities fraud context in
which "catch-all" or "blanket" assertions that do not comply with
the particularity requirements of Rule 9(b) and the PSLRA are
disregarded. <u>Id.</u> Therefore, "unless plaintiffs in securities
fraud actions allege facts supporting their contentions of fraud

with the requisite particularity mandated by Rule 9(b) and [the PSLRA], they may not benefit from inferences flowing from vague or unspecific allegations--inferences that may arguably have been justified under a traditional Rule 12(b)(6) analysis." <u>Id.</u>

**B.   Section 10(b) and Rule 10b-5**

Section 78j ("Section 10(b)")[1] and Rule 10b-5 create liability for securities fraud.  Section 10(b) provides, in pertinent part:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange –
>
> > (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.  Rule 10b-5, which establishes a private cause of action, was promulgated by the SEC in order to implement this section.  <u>Blue Chip Stamps v. Manor Drug Stores</u>, 421 U.S. 723, 729 (1975).  Rule 10b-5 makes it unlawful:

> (a) To employ any device, scheme, or artifice to defraud,

---

[1] Before the Securities Exchange Act was codified, the contents of Section 78j appeared in section 10(b) of Public Law 73-291.  <u>See</u> 73 Pub.L.No. 291, 48 Stat. 881 (1934).  As a result, this provision is commonly referred to as Section 10(b) of the Securities Exchange Act.

> (b) To make any untrue statement of a material fact or
> to omit to state a material fact necessary in order to
> make the statements made, in light of the circumstances
> under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of
> business which operates or would operate as a fraud or
> deceit upon any person, in connection with the purchase
> or sale of any security.

17 C.F.R. § 240.10b-5.

To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff must plead facts that satisfy the heightened pleading requirements of Rule 9(b) and the PSLRA, and must demonstrate that (1) the defendant made a materially false or misleading statement or omitted a material fact necessary to make a statement not misleading, (2) the defendant acted with scienter, and (3) the plaintiff relied on the defendant's misstatements or omissions and this caused the injury.  <u>Chubb Corp.</u>, 394 F.3d at 143.

### 1.   False or Misleading Statements

Defendants can be liable for both affirmative misstatements and misleading omissions.  Omissions, however, can give rise to liability only where the defendant had an affirmative duty to disclose the information in question, such as "when there is insider trading, a statute requiring disclosure, or an inaccurate, incomplete or misleading prior disclosure."  <u>Oran v. Stafford</u>, 226 F.3d 275, 285-86 (3d Cir. 2000); <u>see</u> <u>In re Aetna Inc. Sec. Litig.</u>, 34 F.Supp.2d 935, 948 (E.D. Pa. 1999) ("There

is a duty to disclose information when disclosure is necessary to make defendants' other statements, whether mandatory or volunteered, not misleading."). Under Section 10(b) and Rule 10b-5, each statement at issue must be analyzed to determine whether each alleged misrepresentation is pled with the requisite particularity. In re Westinghouse Sec. Litig., 90 F.3d 696, 712 (3d Cir. 1996). Both pre-class period data and post-class period data can be used to ascertain what the defendant should have known during the class period. In re Merck & Co., Inc. Sec. Litig., 432 F.3d 261, 272 (3d Cir. 2005) (explaining that "any information that sheds light on whether class period statements were false or materially misleading is relevant").

### 2. Materiality

Rule 10b-5 "explicitly require[s] a well-pleaded allegation that the purported misrepresentations or omissions at issue were material." In re Rockefeller, 311 F.3d at 211. A fact is material only if "there [is] a substantial likelihood that [it] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available" to the investing public. TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976). The "materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock." In re Merck & Co., Inc., 432 F.3d at 269 (discussing the efficient market hypothesis).

16

### 3.   Scienter

"[T]o state a violation under Rule 10b-5, plaintiffs must allege that defendants acted with the requisite state of mind." In re Rockefeller, 311 F.3d at 211.  To be actionable, a material misstatement "must be made with conscious or reckless disregard of its falsity."  In re ATI Techs., Inc., Sec. Litig., 216 F.Supp.2d 418, 428 (E.D. Pa. 2002).  As noted supra, to establish this state of mind plaintiffs must plead facts that either (1) constitute circumstantial evidence of either reckless or conscious behavior or (2) establish a "motive and opportunity" to commit fraud.  In re Suprema Specialties, Inc., 438 F.3d at 276.

Conscious misbehavior is alleged by "stating with particularity facts giving rise to a strong inference of conscious wrongdoing, such as intentional fraud or other deliberate illegal behavior."  In re Advanta, 180 F.3d at 535. "A reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to defendant or is so obvious that the actor must have been aware of it.'"  In re Digital Is., 357 F.3d at 332.  Motive and opportunity are properly stated when a plaintiff alleges facts showing that the defendants "had the motive to commit fraud and a 'clear opportunity' to do so."  Wilson v. Bernstock, 195 F.Supp.2d 619, 633 (D.N.J. 2002).

17

### 4.   Reasonable Reliance

To state a claim for securities fraud under Section 10(b) and Rule 10b-5, the plaintiffs must demonstrate that they reasonably relied on the defendants' allegedly fraudulent misrepresentations or omissions.  <u>Jones v. Intelli-Check, Inc.</u>, 274 F.Supp.2d 615, 632 (D.N.J. 2003).  Defendants here do not contest that reasonable reliance has been properly alleged.

### 5.   Damages

Plaintiffs in securities fraud cases must plead (1) damages and (2) that their reliance on the fraud proximately caused those damages.  <u>See</u> <u>Semerenko v. Cendant Corp.</u>, 223 F.3d 165, 174 (3d Cir. 2000).  This second requirement is sometimes called pleading "loss causation".  <u>See</u> <u>id.</u> at 184.  Here, defendants do not contest that plaintiffs have adequately pled both of these elements.

### C.   The Forward-looking Statement Safe Harbor

The PSLRA contains a safe harbor provision, which protects certain forward-looking statements from Section 10(b) and Rule 10b-5 liability.  The safe harbor provision states:

> in any private action arising under [the PSLRA] that is
> based on an untrue statement of a material fact or
> omission of a material fact necessary to make the
> statement not misleading, a person . . . shall not be
> liable with respect to any forward-looking statement,
> whether written or oral, if and to the extent that--
>     (A) the forward-looking statement is–
>         (i) identified as a forward-looking
>         statement, and is accompanied by meaningful
>         cautionary statements identifying important

> > factors that could cause actual results to
> > differ materially from those in the forward-
> > looking statement; or
> > (ii) immaterial; or
> (B) the plaintiff fails to prove that the forward-
> looking statement–
> > (i) if made by a natural person, was made
> > with knowledge by that person that the
> > statement was false or misleading.

15 U.S.C. § 78u-5(c)(1).  In the case of an oral forward-looking statement, the requirements set forth in paragraph (A) are satisfied if (1) the oral statement is accompanied by a cautionary statement noting that the statement is forward-looking and results might materially differ from the projections, (2) the oral statement is accompanied by another oral statement indicating that information concerning risk factors that might cause the actual results to materially differ from the projections is readily available in a written document, (3) such written document is specifically identified, and (4) such written document contains a cautionary statement listing important factors that could cause actual results to differ from the projections.  15 U.S.C. § 78u-5(c)(2).  This safe harbor was designed to protect statements discussing revenue projections and future business plans from causing liability.  In re Merck & Co., Inc., 432 F.3d at 272.

**D.    Section 20(a)**

Section 78t(a) ("Section 20(a)")[2] creates a cause of action against individuals who are "control persons" of companies guilty of securities fraud.  <u>Jones</u>, 274 F.Supp.2d at 644.  It states:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).  Under this section, individuals are held liable for exercising control over a corporation that has committed securities fraud.  <u>In re MobileMedia Sec. Litig.</u>, 28 F.Supp.2d 901, 940 (D.N.J. 1998).  Plaintiffs alleging a Section 20(a) violation "must plead facts showing: (1) an underlying violation by the company; and (2) circumstances establishing defendant's control over the company's actions."  <u>Jones</u>, 274 F.Supp.2d at 645.  Thus, if the plaintiff does not establish that any controlled person is liable under the PSLRA, then there can be no controlling person liability under Section 20(a).  <u>In re Suprema Specialties, Inc.</u>, 438 F.3d at 287.

---

[2] Before the Securities Exchange Act was codified, the contents of Section 78t(a) appeared in section 20(a) of Public Law 73-291.  <u>See</u> 73 Pub.L.No. 291, 48 Stat. 881 (1934).  As a result, this provision is commonly referred to as Section 20(a) of the Securities Exchange Act.

## II.  Section 10(b) and Rule 10b-5 Standards Applied Here

Plaintiffs have identified defendants' allegedly misleading statements with the particularity required by Rule 9(b). Plaintiffs have specifically set forth in their detailed complaint each statement they believe was false or misleading, the party that made each statement, the context in which each statement was made, and the reasons why they believe each statement was false or misleading.  Thus, plaintiffs have adequately established the who, what, when, where and how of the events at issue.  See Chubb Corp., 394 F.3d at 144; In re Rockefeller, 311 F.3d at 217.

To meet their pleading burden, plaintiffs rely primarily on confidential, personal knowledge sources including, a former Avaya Technical Manager in the Performance Communications Group, a former Global Contract Manager, an employee responsible for evaluating profits for special bids in the Services Organization, and a former Senior Client Analyst.  (Compl., at ¶¶ 32-33, 46(a)-(c), 52(b)-(c), 64(b), 93.)  Plaintiffs have appropriately described the positions formerly held by each of these sources as well as the basis of the sources' personal knowledge.  (Id.) Compare Chubb Corp., 394 F.3d at 148-54 (concluding that the plaintiffs had not met their pleading burden because the confidential sources they relied upon were low-level, branch office employees working in departments other than the department

21

at issue, and thus, these sources lacked personal knowledge concerning the defendant's national business in a separate department). However, plaintiffs have not demonstrated that all of defendants' statements were false or misleading when made. Moreover, with respect to the remaining statements, plaintiffs have failed to establish the strong inference of scienter required by the PSLRA's heightened pleading standard. See 15 U.S.C. § 78u-4(b)(2). Specifically, plaintiffs have not alleged facts showing either conscious misbehavior or recklessness on the part of defendants, or motive and opportunity for defendants to commit fraud. See In re Suprema Specialties, Inc., 438 F.3d at 276.

### A.    Whether Defendants' Statements Were False or Misleading

The Third Circuit, in In re Advanta Corp., analyzed whether statements made by a corporate defendant and its officers were materially false or misleading. 180 F.3d 525. In that case, Advanta Corporation ("Advanta"), a leading issuer of MasterCard and Visa credit cards, instituted a new policy of issuing credit cards with lower teaser rates and longer introductory periods than standard industry practice in order to attract riskier customers. Id. at 528. Many of these new, riskier customers defaulted on their repayment obligations, which increased the company's delinquency rates and increased costs related to uncollectible card holder balances. Id. The shareholders of

Advanta brought a securities class action against the company and
several of its officers claiming that Advanta failed to disclose
its "teaser rates" policy despite knowledge of the risks
involved.  Id.  The shareholders further claimed that Advanta's
officers made various false or misleading statements, including
the following statement made by Advanta's Vice President for
Investor Relations:

> Over the next six months Advanta will experience a
> large increase in revenues as it converts more than $5
> billion in accounts that are now at teaser rates of
> about 7% to its normal interest rate of about 17%.

Id.  The shareholders also identified the following statements in
which Advanta allegedly portrayed itself in an unduly positive
light even though it knew such statements were false or
misleading:

> Despite a challenging industry environment, we are
> pleased to report that Advanta produced continued,
> consistent earnings growth in the third quarter.

> The challenges in the delinquency and charge-off rates
> from year-to-year . . . reflect the trend in unsecured
> credit quality which is being experienced throughout
> the credit industry.

> This dividend increase reflects management's confidence
> in the company's earnings momentum and Advanta's
> continuing commitment to enhancing shareholder value.

> I am pleased to report that in 1996 Advanta maintained
> the growth of its current businesses and accelerated
> its expansion into new ventures.

Id. at 529.  The shareholders alleged, inter alia, that both the
Vice President's statement and these positive portrayals violated

23

Section 10(b) and Rule 10b-5.  <u>Id.</u>  Advanta moved to dismiss the shareholders' complaint, and the district court granted the motion.  <u>Id.</u>

The Third Circuit, in addressing the appeal, noted that the PSLRA contains a safe harbor provision that protects certain forward-looking statements from Rule 10b-5 liability.  <u>Id.</u> at 535.  The court explained that the statement made by Advanta's Vice President for Investor Relations constituted a forward-looking statement because it involved a projection of revenues as well as a statement of the plans and objectives of management for future operations.  <u>Id.</u> at 536.  Nevertheless, the court explained that the safe harbor does not apply if the statement is made with actual knowledge that it is false or misleading.  <u>Id.</u>  The court concluded that the shareholders' complaint did not plead any specific facts supporting the inference that Advanta had actual knowledge that this statement was false.  <u>Id.</u>  Thus, the court held that the statement was protected by the PSLRA's safe harbor provision.  <u>Id.</u> at 537.

The court also considered whether the shareholders adequately pled their claims with respect to the positive portrayal statements.  <u>Id.</u>  The court stated, "Rule 10b-5 liability does not attach merely because 'at one time the firm bathes itself in a favorable light' but 'later the firm discloses that things are less rosy.'"  <u>Id.</u> at 538 (quoting <u>DiLeo v. Ernst &</u>

24

_Young_, 901 F.2d 624, 627 (7th Cir. 1990)).  The court noted that during the period that Advanta made the positive portrayal statements it (1) implemented policies relaxing underwriting and monitoring procedures causing superior credit risk customers to switch to other credit card companies at rates causing a materially negative impact on the companies' earnings, (2) changed its methodology for computing bankruptcy charge-offs but did not disclose this change to the public, (3) repriced its teaser rates to only 13 or 14 percent, rather than the usual 17 percent, causing a substantial decline in revenues, and (4) lacked adequate collections capabilities to support the expansion of its customer base.  _Id._  However, the court disagreed with the shareholders' assertion that the juxtaposition of these facts against the positive portrayal statements indicated that those statements were false or misleading.  _Id._  The court stated that Advanta was merely reporting its previous successes and expressing confidence in its prospects for future growth.  _Id._ The court explained that "vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.'" _Id._  Thus, the court concluded that the positive portrayal statements were all either accurate reports of past earnings or non-actionable expressions of optimism for the future.  _Id._ at 539.

Plaintiffs challenge statements made in Avaya's October 5, 2004 press release and corresponding conference call announcing Avaya's agreement to acquire Tenovis and describing the companies as having "complementary businesses and strategies" and explaining that Tenovis would "have a positive financial impact within a short period of time" and is an "excellent strategic" and "strong operational fit". (Compl., at ¶¶ 28-29; Defs. Br., at 9.)  Plaintiffs also challenge statements made in a subsequent press release and conference call releasing Avaya's fourth quarter results for fiscal year 2004, which (1) positively portray Avaya as, inter alia, "well positioned to translate [its] success in the marketplace into enhanced shareholder value", converting its "momentum into increased profitability and financial strength", and a "stronger more competitive organization that enjoy[s] significant potential . . . to further build shareholder value", and (2) describe Avaya's fiscal year 2004 as "a year of substantial accomplishment and progress" in which Avaya "delivered on commitment in key areas". (Compl., at ¶¶ 37-38; Defs. Br., at 10.)

Plaintiffs, however, have failed to establish that defendants' statements regarding either the anticipated benefits of the Tenovis acquisition or Avaya's fourth quarter results for fiscal year 2004 constituted false or misleading statements when they were made.  Rule 10b-5 liability does not attach simply

26

because Avaya portrayed itself and its acquisition of Tenovis in a favorable light and it was later revealed that things were not entirely favorable.  See In re Advanta Corp., 180 F.3d at 538. Similar to the defendants in Advanta, defendants' statements here were simply reports of Avaya's previous successes in the fourth quarter of 2004, expressions of optimism about the company's prospects for future growth, and statements suggesting the company's plans for attaining its growth goals in connection with the Tenovis acquisition.  (See Compl., at ¶¶ 28-29.)  Therefore, plaintiffs' allegation concerning the juxtaposition of certain facts, including the fact that substantial integration problems and unbudgeted costs arose during the Tenovis integration, does not definitively establish that defendants' statements were false or misleading when made.  This Court will not use hindsight to impose Section 10b and Rule 10b-5 liability.  See Chubb Corp., 394 F.3d at 158 ("We have long rejected attempts to plead fraud by hindsight.")

Plaintiffs also allege that Avaya predicted that its revenue growth would be between 25 and 27 percent and its operating margin would be between 8.5 to 9 percent for fiscal year 2005 without any basis for these predictions.  (Compl., at ¶ 48; Defs. Br., at 10.)  Further, plaintiffs challenge statements made in a January 2005 press release and during a corresponding conference call, which pertain to Avaya's financial and operational results

for the first quarter of fiscal year 2005.  Specifically,
defendants stated that the quarter's results "position [Avaya] to
meet [its] goals for the year", the company was "on track to meet
[its] goals for the year", and Avaya's business was "performing
largely as expected".  (Compl., at ¶¶ 57, 59-60; Defs. Br., at
11.)  Again, these statements constitute reports of Avaya's
previous successes and expressions of optimism for Avaya's
future.  Under the <u>Advanta</u> analysis, such statements are not
actionable under Section 10(b) and Rule 10b-5.  <u>See</u> <u>In re Advanta
Corp.</u>, 180 F.3d at 538-39.  Accordingly, neither the adequately
pled facts nor a review of defendants' actual statements
regarding the Tenovis acquisition, Avaya's accomplishments in
fiscal year 2004, or Avaya's goals for fiscal year 2005
demonstrate that these statements were false or misleading at the
time they were made.

**B.   Whether There is a Strong Inference of Scienter**

This Court, in addition to finding that defendants have
shown that many of their statements were not false or misleading
when made, also finds that plaintiffs have failed to establish
the requisite scienter with respect to the remaining statements
at issue.  Plaintiffs assert that defendants' false and
misleading statements about Avaya's operating margins, the
Tenovis integration, and whether or not Avaya was suffering from
price competition were core matters of critical importance to

Avaya.  (Pls. Br., at 16.)  Plaintiffs further assert that there
is a strong inference that officers and directors of a company
are aware of matters central to the core business of the company
and have knowledge of facts surrounding these core matters.  (Id.
at 15.)  Plaintiffs argue that defendants repeatedly made
statements to the public and analysts that were directly contrary
to the information available on these core matters, and thus,
defendants either made such statements knowing their falsity or
acted with extreme, reckless disregard for the truth.  (Id.)  In
the alternative, plaintiffs contend that they have established
that defendants had a motive and opportunity to commit fraud.
(Id. at 20-22.)  This Court disagrees with those contentions,
however, and finds that plaintiffs have not met their burden of
pleading scienter.

### 1.   Conscious or Reckless Disregard for Falsity

The Third Circuit, in Advanta, also analyzed whether the
shareholder plaintiffs had demonstrated the requisite scienter
under Section 10(b) and Rule 10b-5 by establishing that the
defendants acted with conscious or reckless disregard for their
statements' falsity.  180 F.3d at 539.  The court explained that
scienter cannot rest on the bare inference that the defendant
"must have had knowledge" of certain facts.  Id.  "[A]llegations
that a securities-fraud defendant, because of his position within
the company 'must have known' a statement was false or misleading

29

are 'precisely the types of inferences which [courts], on numerous occasions, have determined to be inadequate to withstand Rule 9(b) scrutiny.'" Id.  Further, the court disagreed with the shareholders' assertion that Advanta's positive portrayal statements were reckless in light of either industry-wide increases in personal bankruptcies and charge-offs, or Advanta's decision to reprice the teaser rates at 13 or 14 percent rather than 17 percent.  Id.  The court stated that the shareholders' allegations, even if true, did not sufficiently demonstrate an extreme departure from the standards of ordinary care necessary to find that a defendant acted recklessly.  Id. at 540.  The court explained that the facts set forth in the complaint indicated that Advanta had been mismanaged, but did not suggest that Advanta had egregiously departed from the range of reasonable business decisions.  Id.  The court also refused to infer fraudulent intent from the fact that the defendant officers sold stock during the time period in which the positive portrayal statements were made, since the shareholders failed to plead facts indicating whether (1) such trades were normal and routine, and (2) whether the profits of such trades were substantial in comparison to the amount of stock held by the officers.  Id.  The court ultimately held that the district court properly dismissed the shareholders' claims.  Id. at 542.

Plaintiffs have not made a concrete showing that defendants acted with conscious or reckless disregard for truth when they predicted positive effects resulting from the Tenovis acquisition and that Avaya would have significant accomplishments during fiscal year 2005. Plaintiffs infer from difficulties Avaya encountered in integrating Tenovis, discounts Avaya gave to customers in one of its programs, and the competition in Avaya's industry that defendants "must have known" that their statements were false. However, these factors alone do not suggest a "strong inference" that Avaya knew its statements were false or its optimistic outlook was unfounded, particularly because defendants stated that they believed the Tenovis acquisition would significantly improve Avaya's position in the overseas market. Although it now appears that Avaya's management overlooked some of the difficulties Avaya would encounter in 2005 due to its competition and problems with the Tenovis integration, this does not show that Avaya egregiously departed from the range of reasonable business decisions. Accordingly, plaintiffs rely on mere inferences that defendants knew their statements were false or acted recklessly and such inferences are impermissible under <u>Advanta</u>. <u>See</u> <u>In re Alpharma Inc. Sec. Litig.</u>, 372 F.3d 137, 150 (3d Cir. 2004) (noting that the plaintiffs simply alleged that the defendant set lofty quarterly sales goals and pressured sales representatives to meet them, and such conclusory

inferences are insufficient under the securities fraud pleading requirements).  Thus, the facts listed in the complaint suggesting that defendants either "must have known" their statements concerning the Tenovis acquisition and Avaya's projected 2005 fiscal year were false or recklessly disregarded the truth are insufficient to establish scienter under the PSLRA's stringent standard.

Plaintiffs have similarly failed to plead scienter sufficiently with respect to McGuire's statements that price competition in the industry "is not different than what it has been", was "fairly steady", and that there was nothing "particularly noteworthy" in the pricing trend line.  (Compl., at ¶¶ 39, 73; Defs. Br., at 11.)  Plaintiffs contend that McGuire knew these statements were false at the time he made them because Avaya (1) was unable to compete with its industry rivals due to the breakdown of its operational model, (2) had shrinking margins in the face of stiff competition, (3) was giving substantial discounts to maintain business, and (4) was experiencing severe pricing pressure from its rivals.  (Compl., at ¶ 46(a)-(b), 79(b).)

Plaintiffs, however, have not stated that McGuire discussed pricing pressure with others either inside or outside the company.  See In re Advanta Corp., 180 F.3d at 539 (distinguishing case where extrinsic evidence such as discussions

32

among officers created strong inference of scienter).  Instead,
plaintiffs rely on generalized imputations of knowledge about the
trends and competition in Avaya's industry, and inferences drawn
from the fact that Avaya offered discounts in one of its programs
during the class period, but such imputations and inferences are
not strong evidence of scienter.  See id.; see also In re
Alpharma Inc., 372 F.3d at 151 ("[P]laintiffs' allegations rest
on nothing more than a 'series of inferences . . . too tenuous to
amount to one of those highly unreasonable omissions or
misrepresentations that involve not merely simple or even
inexcusable negligence, but an extreme departure from the
standards of ordinary care.'").  Plaintiffs have not shown
specific facts supporting a strong inference that McGuire was
actually aware that his statements regarding industry pricing
trends were false, but instead rely on their conclusory assertion
that McGuire "must have known" his statements were false by
virtue of his position in the company.  Under Advanta, however, a
pleading of scienter cannot rely only on the inference that a
defendant "must have known" that his statements were false; there
must be a concrete showing of intentional or deliberate
misbehavior.  In re Advanta Corp., 180 F.3d at 535, 539; see also
In re Alpharma Inc., 372 F.3d at 149.

   Plaintiffs here also attempt to plead the requisite scienter
on the part of McGuire by alleging that he recklessly disregarded

negative industry trends and customer difficulties experienced by
Avaya.  As the Third Circuit held in <u>Advanta</u> when faced with
similar allegations, these allegations do not demonstrate the
"'extreme departure' from the standards of ordinary care", as
opposed to simple mismanagement, that is necessary to support a
strong inference of recklessness.  <u>Id.</u> at 540.  Therefore,
plaintiffs have failed to demonstrate conscious or reckless
disregard for falsity with respect to McGuire's statements about
pricing competition and trends in Avaya's industry.

### 2.   Motive to Commit Fraud

Plaintiffs allege, in the alternative, that they have
sufficiently pled scienter by establishing that defendants had a
motive and opportunity to commit fraud.  (Pls. Br., at 20.)
Specifically, plaintiffs contend that Avaya was motivated to make
false and misleading statements to enable it to (1) redeem $548.7
million of a certain class of its debt using its own inflated
stock as currency rather than cash, and (2) obtain an unsecured
revolving credit facility with more favorable terms than its
previous secured credit facility.  (Pls. Br., at 20-22.)
Plaintiffs further contend that McGuire and Peterson were
motivated to make the alleged false and misleading statements
because they (1) would be awarded under Avaya's special incentive
plan based on the financial results achieved by Tenovis in 2005,
and (2) sold large amounts of Avaya shares for insider trading
purposes during the class period.  (<u>Id.</u> at 22.)

The Third Circuit, in <u>GSC Partners CDO Fund v. Washington</u>, established that "[i]n every corporate transaction, the corporation and its officers have a desire to complete the transaction, and officers will usually reap financial benefits from a successful transaction" but "[s]uch allegations alone cannot give rise to a 'strong inference' of fraudulent intent." 368 F.3d 228, 237 (3d Cir. 2004). There, the plaintiffs alleged that they purchased notes from Washington Group International, Inc. ("Washington"), an international engineering and construction firm, due to false and misleading statements contained in Washington's offering circular. <u>Id.</u> at 232. Washington used the money it raised from selling the notes to purchase Raytheon Engineers & Constructors International, Inc. ("REC"). <u>Id.</u> The plaintiffs commenced an action against individual officers and directors of both Washington and its lead underwriter alleging violations of federal and state securities laws. <u>Id.</u> at 236. The district court granted the defendants' motion to dismiss the complaint for failure to state a claim. <u>Id.</u>

The key issue before the Third Circuit was whether the plaintiffs had stated facts in the complaint with enough particularity to create a strong inference that the defendants included false or misleading statements in Washington's offering circular with the required state of mind. <u>Id.</u> at 237. The court

noted, "'[b]lanket assertions of motive and opportunity' will not suffice, and 'catch-all allegations that defendants stood to benefit from wrongdoing and had the opportunity to implement a fraudulent scheme are no longer sufficient, because they do not state facts with particularity or give rise to a strong inference of scienter.'" Id.  The court explained that motives that are generally possessed by corporate officers are not sufficient to establish scienter.  Id.  Instead, the plaintiffs must assert that the individual defendants received concrete and personal benefits from the fraud.  Id.

The court in GSC Partners acknowledged the plaintiffs' argument that Washington and the individual defendants were motivated to commit fraud because (1) Washington would not have been able to acquire REC without successful issuance of the notes at or near the price sought and Washington would not have been able to sell the notes for this price if it had revealed its true financial condition in the offering circular, and (2) the individual defendants would receive stock options after the REC merger was completed.  Id.  The court held, however, that these allegations were insufficient to establish the requisite scienter under Section 10(b) and Rule 10b-5 because asserting that corporate officers have a desire to, inter alia, complete a transaction, maintain a high credit rating, or negotiate a contract do not create a strong inference of fraudulent intent. Id. at 237-38 (listing cases).

36

Plaintiffs here have not established a strong inference that defendants had both the motive and opportunity to commit fraud. Like the plaintiffs in GSC Partners, plaintiffs attempt to use defendants' desire to redeem notes representing a certain class of debt to establish motive to commit fraud. However, the Third Circuit concluded that a company's desire to sell, or in this case redeem, notes at a particular price is not sufficient to establish such a motive. Id. at 237. Further, Avaya had sufficient cash to cover the $548.7 million redemption, and thus, did not need to inflate stock prices to ensure that it would be able to reduce its outstanding debt. (Defs. Br., at 40.)

Avaya entered into a new credit facility during the class period, but that does not provide a sufficient motive for defendants to make fraudulent or misleading statements. The desire to raise funds and obtain a credit facility with favorable terms is a motive generally possessed by most corporate officers. See GSC Partners, 368 F.3d at 237. Thus, this generic desire cannot establish scienter. See In re Interpool, Inc. Sec. Litig., No. 04-321, 2005 U.S. Dist. LEXIS 18112, at *33-*34 (D.N.J. Aug. 17, 2005) (finding that defendant's need to secure a new credit facility did not establish motive for defendant to commit fraud); Wilson, 195 F.Supp.2d at 634 (noting that "'a company's desire to maintain a high bond or credit rating' does not 'qualify as sufficient motive for fraud . . . because if

scienter could be pleaded on that basis alone, virtually every company in the United States that experiences a downturn in stock price could be forced to defend securities fraud actions'").

McGuire and Peterson will benefit under the Tenovis special incentive plan if the Tenovis integration succeeds, but this also does not create a strong inference of fraudulent intent.  As previously stated, all corporate officers desire to complete proposed transactions and usually reap financial benefits if the transactions are successful.  GSC Partners, 368 F.3d at 237. Accordingly, the Tenovis special incentive plan is not in any way unusual, and thus, allowing this plan to support plaintiffs' allegation that McGuire and Peterson were motivated to commit fraud would leave nearly all corporate officers susceptible to securities fraud allegations whenever their company's stock declined in value.  Therefore, the existence of an employee or officer incentive program such as the Tenovis special incentive plan does not constitute a motive for securities fraud.

Plaintiffs likewise cannot create a strong inference of fraudulent intent from McGuire and Peterson's sale of a portion of their Avaya stock during the class period.  Although plaintiffs assert that these stock trades were not usual or routine, they do not set forth the actual percentage of stock Peterson or McGuire traded during the class period or whether these trades were substantial in comparison to the total amount

38

of stock held by each of them.  (Compl. at ¶ 97; Defs. Br., at 35-37.)  See In re Advanta Corp., 180 F.3d at 539 (refusing to infer fraudulent intent from stock sale during the class period because the plaintiffs failed to demonstrate whether the profits of these sales were substantial in comparison to the amount of stock the defendants held).  In fact, McGuire and Peterson each sold less than 5 percent of their total available shares during the class period.  (Defs. Br., at 36.)  Further, plaintiffs concede that they do not rely on McGuire and Peterson's sale of stock to prove scienter.  (Pls. Br., at 23.)  Therefore, plaintiffs have not shown that defendants had a motive to commit fraud, and thus, have not established the requisite scienter.

### C.   The Materiality of Defendants' Statements

Defendants' allegedly false and misleading statements concerned Avaya's (1) accomplishments in fiscal year 2004, (2) expected operating margin for fiscal year 2005, (3) expected growth in revenues and operating income, (4) ability to withstand competition in the marketplace, and (5) ability to successfully integrate acquired companies such as Tenovis.  Accordingly, many of the statements at issue concerned material facts that were likely viewed by reasonable investors as affecting the "total mix" of information available to the public.  See TSC Indus., Inc., 426 U.S. at 449.  Furthermore, the statements are material because Avaya's stocks dropped immediately after it was disclosed

that (1) Avaya would not meet its expected operating margin for fiscal year 2005 or its expected growth in revenues and operating income, (2) Avaya's strategy for dealing with its competition had not worked as planned, and (3) there had been problems and setbacks with the integration of Tenovis. (Compl., at ¶ 88.)  See In re Merck & Co., Inc., 432 F.3d at 269.  Therefore, plaintiffs have met their burden under Section 10(b) and Rule 10b-5 of demonstrating that defendants' statements were material.  Nevertheless, as discussed supra, plaintiffs have not established the requisite scienter on the part of defendants or that certain of defendants' statements were false or misleading when made, and thus, they have not met their pleading burden under the PSLRA.

**D.   Reasonable Reliance and Damages**

Defendants do not contend that plaintiffs failed to properly plead either reasonable reliance or damages.  Thus, this Court will not address these two elements of plaintiffs' Section 10(b) and 10b-5 claim.

**E.   The PSLRA Safe Harbor Applied Here**

Many of defendants' statements also constitute forward-looking statements protected by the PSLRA's safe harbor provision.  A forward-looking statement is defined as including statements (1) "containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, . . . or other financial terms", (2) of management's plans

40

and objectives for future operations, and (3) "of future economic performance".  15 U.S.C. § 78u-5(I).  Present tense statements may constitute predictions about a company's future.  See GSC Partners, 368 F.3d at 242 (finding present tense statement about collectability was a prediction of the likelihood of collection, and thus, was a "classic" forward-looking statement).

Defendants' statements made in the October 5, 2004 press release and corresponding conference call describing Avaya's plans and expectations regarding the Tenovis acquisition each concern plans and objectives for Avaya's future operations as well as its future economic performance.  (Compl., at ¶¶ 28-29.) For example, defendants describe, inter alia, (1) how Tenovis will "significantly enhance" Avaya and "have a positive financial impact within a short period of time", (2) the effect the acquisition will likely have on earnings per share, (3) their plan to form a dedicated team to handle the Tenovis integration, and (4) the predicted costs Avaya will likely incur as a result of the acquisition.  (Id.)  Accordingly, these statements are forward-looking because they discuss management's plans for successfully integrating Tenovis and predict how the Tenovis acquisition will both positively and negatively impact Avaya's business in the future.

Many of defendants' statements in the October 26, 2004 press release and corresponding conference call, the October 29, 2004

41

press release, the 2004 Avaya Financial Analyst Conference, the January 25, 2005 press release and conference call, and the March presentations were also forward-looking.  Specifically, the statements predicting the positive effects the Tenovis acquisition will have on revenues and Avaya's size and scale in Europe, and the predictions concerning Avaya's operating margin, operating income growth percentage, and revenue growth percentage for fiscal year 2005 all constituted both projections of revenue and statements of future economic performance.  (Compl., at ¶¶ 37-38, 49, 50, 57, 60, 69, 76.)  Moreover, present tense statements such as "[o]ur first quarter results position us to meet our goals for the year", "we believe we can do better in the U.S. as we move through the year", and "we continue to focus on achieving our annual goals for the year and remain confident in our ability to do so" are also forward-looking predictions of future economic performance, as well as statements indicating management's plans and objectives.  (Compl., at ¶¶ 57, 59.)

Defendants noted in each of the conference calls, press releases and presentations that forward-looking statements were contained therein.  (Defs. Br., at 16.)[3]  Further, defendants

---

[3] For example, Avaya's October 26, 2004 press release states, "[t]his news release contains forward-looking statements regarding the company's outlook for operating results based on current expectations . . . ."  (Margolis Decl., Ex. M, at 3.) Avaya's other press releases, conference calls and presentations during the class period contain similar statements.

accompanied the forward-looking statements with "meaningful cautionary statements identifying important factors that could cause actual results to differ."  (Id.)  See 15 U.S.C. § 78u-5(c)(1)(A).  Such cautionary language must be directly related to the forward-looking statements, but need not actually accompany the statements.  GSC Partners, 368 F.3d at 243 n.3.  For example, Avaya's Form 8-K dated March 2, 2005 acknowledges that it contains forward-looking statements and explains that they "may turn out to be wrong" and can be affected by "inaccurate assumptions [Avaya] might make or by known or unknown risks and uncertainties."  (Margolis Decl., Ex. E, at 2.)  It also advises readers to consult Avaya's further disclosures in its other Form 8-K, Form 10-K, and Form 10-Q reports.  (Id.)

Avaya's press releases each explained that the forward-looking statements contained therein "involve[d] risks and uncertainties that could cause actual outcomes and results to differ materially" including, but not limited to,

> general industry market conditions and growth rates and general domestic and international economic conditions including interest rate and currency exchange rate fluctuations . . . price and product competition, rapid technological development, dependence on new product development, the successful introduction of new products, the mix of our products and services, customer demand for our products and services, the ability to successfully integrate acquired companies, control of costs and expenses, the ability to implement in a timely manner our restructuring plans, and the ability to form and implement alliances.

(Margolis Decl., Ex. M, at 3, Ex. O, at 1-2, Ex. P, at 3, Ex. R,

at 4, Ex. T, at 3-4, Ex. U, at 3.)  Additionally, the press
releases directed investors to see Avaya's SEC filings for a
further list and description of risks affecting the forward-
looking statements.  (Id.)  Lastly, an Avaya representative
stated at the beginning of each of the conference calls following
the press releases that the call would contain forward-looking
statements based on outlooks that could materially differ from
actual results.  (Margolis Decl., Ex. N, at 2, Ex. P, at 2, Ex.
S, at 3, Ex. V, at 1 .)  The Avaya representative then directed
call participants to see Avaya's SEC filings for a more detailed
discussion of risks that could affect results.  (Id.)

     These cautionary statements are not vague or blanket
disclaimers, but instead are substantive, extensive, and tailored
to the future-looking statements they reference, particularly
because they direct the public to Avaya's SEC filings, which
contain a detailed discussion of factors that could affect their
future economic performance.  See GSC Partners, 368 F.3d at 243
n.3 (citing cases referring to the "bespeaks caution" doctrine,
which provides common law protection to forward-looking
statements accompanied by cautionary language, and noting that
cautionary language must be "extensive and specific" and
"substantive and tailored to the specific future projections,
estimates, or opinions").  Finally, as discussed supra,
plaintiffs have not pled facts demonstrating that defendants'

statements were made with actual knowledge that they were false or misleading.  See In re Advanta Corp., 180 F.3d at 536 (noting that the safe harbor does not apply if the statement is made with actual knowledge that it is false or misleading).  Therefore, defendants' statements describing Avaya's plans and expectations for the Tenovis acquisition and integration, and predicting Avaya's operating margin, income growth percentage, and revenue growth percentage for fiscal year 2005 are protected by the PSLRA's statutory safe harbor.

    Although some of the allegedly false or misleading statements set forth in the complaint are not covered by the PSLRA's safe harbor provision, these statements also are not actionable under Section 10(b) or Rule 10b-5 because, as we have discussed supra, plaintiffs have failed to establish the requisite scienter or have not demonstrated that such statements were false or misleading when made.

## III. Section 20(a) Standard Applied Here

    Plaintiffs allege that Peterson and McGuire, "[b]y virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated to the investing public" were "controlling persons" of Avaya under Section 20(a). (Compl., at ¶ 136.)  However, plaintiffs have not pleaded facts

adequate to establish that Avaya is liable under Section 10(b) or Rule 10b-5 with the particularity required by the PSLRA.  Thus, because there can be no liability for the underlying company, there can be no "controlling person" liability under Section 20(a) for either Peterson or McGuire.  See Jones, 274 F.Supp.2d at 645; In re Suprema Specialties, Inc., 438 F.3d at 287.

### CONCLUSION

The Court, for the reasons stated supra, will (1) grant the motion, and (2) dismiss plaintiffs' claims with prejudice.[4]  The Court will issue an appropriate order and judgment.


                                       s/ Mary L. Cooper
                                **MARY L. COOPER**
                                United States District Judge

---

[4] We do not believe that plaintiffs should be given an opportunity to amend the complaint because it appears that they have already set forth all facts available to them in support of their claims, and have not shown that defendants are liable under Section 10(b) and Rule 10b-5.  Thus, allowing plaintiffs to replead would be futile since no amendment would satisfy the stringent pleading requirements of Rule 9(b) and the PSLRA.  See In re Alpharma Inc., 372 F.3d at 153-54 (noting that leave to amend should not be granted if the amendment would be futile, and affirming district court's denial of leave to amend and dismissal of the complaint with prejudice).  Thus, dismissal here is with prejudice.