COHN LIFLAND PEARLMAN
   HERRMANN & KNOPF LLP
PETER S. PEARLMAN
JEFFREY W. HERRMANN
Park 80 Plaza West-One
Saddle Brook, NJ  07663
Telephone:  201/845-9600
201/845-9423 (fax)

Liaison Counsel

ROBBINS GELLER RUDMAN
   & DOWD LLP
ARTHUR C. LEAHY
THEODORE J. PINTAR
JEFFREY D. LIGHT
SHANNON M. MATERA
FRANCIS A. DIGIACCO
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

Lead Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| HOWARD CHARATZ, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> vs. <br><br> AVAYA, INC., et al., <br><br> Defendants. | No. 3:05-cv-02319-MLC-TJB **(Consolidated)** <br><br> <u>CLASS ACTION</u> <br><br> DATE:    September 27, 2010 <br> TIME:     1:00 p.m. <br> COURTROOM:   The Honorable <br>                      Mary L. Cooper |

DECLARATION OF ARTHUR C. LEAHY IN SUPPORT OF LEAD
PLAINTIFFS' MOTION FOR (A) FINAL APPROVAL OF CLASS ACTION
SETTLEMENT AND PLAN OF ALLOCATION OF SETTLEMENT
PROCEEDS; AND (B) AN AWARD OF ATTORNEYS' FEES AND EXPENSES

570721_1

# TABLE OF CONTENTS

**Page**

I.  PRELIMINARY STATEMENT ................................................................. 2

II.  SUMMARY OF LEAD PLAINTIFFS' ALLEGATIONS ............................ 9

III.  HISTORY OF THE ACTION .................................................................. 11

    A.  Initiation of the Action and Selection of Lead Plaintiffs ................... 11

    B.  The Complaint .................................................................. 13

    C.  Motion to Dismiss ............................................................ 13

    D.  Appeal ............................................................................. 15

    E.  Merits Discovery .............................................................. 17

    F.  Class Certification and Class Discovery ............................. 18

    G.  Settlement Negotiations and Terms of the Settlement ...................... 18

IV.  FACTORS TO BE CONSIDERED IN SUPPORT OF
SETTLEMENT ...................................................................................... 20

    A.  The Settlement Was Fairly and Aggressively Negotiated by
Counsel ............................................................................ 20

    B.  Serious Questions of Law and Fact Placed the Outcome of the
Class Action in Significant Doubt ...................................... 20

    C.  The Judgment of the Parties that the Settlement Is Fair and
Reasonable Supports Approval of the Settlement ............................. 23

V.  THE PLAN OF ALLOCATION .............................................................. 24

VI.  FACTORS TO BE CONSIDERED IN SUPPORT OF THE
REQUESTED ATTORNEYS' FEE AWARD ......................................... 29

    A.  Extent of Litigation ......................................................... 31

**Page**

B.  The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases ................................................................................. 31

C.  Standing and Expertise of Lead Plaintiffs' Counsel ......................... 36

D.  Standing and Caliber of Opposing Counsel ...................................... 36

VII.  CONCLUSION ................................................................................. 36

I, ARTHUR C. LEAHY, declare as follows:

1.     I am a member of Robbins Geller Rudman & Dowd LLP ("Robbins Geller").[1] Robbins Geller is lead counsel for the Lead Plaintiffs in this action ("Lead Counsel").[2] I was actively involved in the prosecution of this action (hereinafter, the "Litigation"), am familiar with its proceedings, and have personal knowledge of the matters set forth herein based upon my active supervision and participation in all material aspects of the case, in addition to information provided to me by people working at my direction.

2.     I submit this declaration in support of Lead Plaintiffs' application, pursuant to Rule 23 of the Federal Rules of Civil Procedure, for final approval of (a) the Stipulation of Settlement dated March 31, 2010 (the "Stipulation"), which provides for the payment of $4.5 million (the "Settlement Fund"), (b) the proposed

---

[1]     On September 1, 2007, Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin") changed their law firm name to Coughlin Stoia Geller Rudman & Robbins LLP. A Notice of Firm Name Change was filed with the Court on September 7, 2007. On March 31, 2010, Coughlin Stoia Geller Rudman & Robbins LLP ("Coughlin Stoia") then changed their law firm name to Robbins Geller Rudman & Dowd LLP. A Notice of Firm Name Change was filed with the Court on March 30, 2010.

[2]     Lead Plaintiffs are National Elevator Industry Pension Fund ("NEIP"), City of Livonia Employees' Retirement System ("Livonia"), District No. 9, I.A. of M. & A.W. Pension Trust ("District No. 9"), UFCW Local 880 – Retail Food Employees Joint Pension Fund, and UFCW Local 880 Union-Employer Pension Fund (collectively, the "UFCWs").

- 1 -

Plan of Allocation of settlement proceeds ("Plan of Allocation"), and (c) Lead Plaintiffs' counsel's application for attorneys' fees and expenses.

## I.  PRELIMINARY STATEMENT

3.      The purpose of this declaration is to set forth the background of this case, its procedural history, the factual investigation and prosecution of the action, and the negotiations that led to the settlement.  Further, this declaration demonstrates why the settlement is fair, reasonable, and adequate and should be approved by the Court, why the Plan of Allocation is fair and reasonable, and why Lead Plaintiffs' counsel's attorney fee and expense request is reasonable and should be approved.

4.      This case has been vigorously litigated over the course of five years.  At every stage of the Litigation, counsel for Defendants have asserted aggressive defenses and expressed their belief that the Class could not and should not prevail on the claims asserted.  The settlement was not achieved until Lead Plaintiffs, through their counsel's efforts:

- Conducted a detailed investigation, including using in-house and outside professional investigators, interviewing 35 confidential witnesses, including former employees of defendant Avaya, Inc. ("Avaya" or the "Company"), and reviewing media, analysts' reports, Securities and Exchange Commission ("SEC") filings, and articles concerning Avaya to meet the Private Securities Litigation Reform Act of 1995's ("PSLRA") stringent pleading standards;

- Litigated a complicated motion to dismiss;

- Fully briefed and argued an appeal and overturned (in part) a decision in favor of Defendants'[3] challenges to the Complaint[4];

- Provided detailed initial disclosures of discovery to Defendants, as well as received, reviewed, and analyzed Defendants' initial disclosures;

- Engaged in lengthy meet and confers with Defendants regarding discovery;

- Responded to discovery propounded by Defendants in the form of requests for production of documents and interrogatories;

- Filed a motion for class certification; and

- Engaged in extensive settlement negotiations.

5.      This settlement is a product of spirited and hard-fought litigation and takes into consideration the significant risks specific to the case.  It was negotiated by experienced counsel for Lead Plaintiffs and Defendants with a firm understanding of both the strengths and weaknesses of their respective cases.

6.      The settlement will provide Class Members with an immediate and substantial benefit now and avoids the very real risk of no recovery if the Litigation were to continue to summary judgment or trial.   Despite Lead Plaintiffs' and

---

[3]      Defendants are Avaya, Donald K. Peterson ("Peterson"), Chief Executive Officer at Avaya during the Class Period, and Garry K. McGuire, Sr. ("McGuire"), Chief Financial Officer at Avaya during the Class Period.

[4]      The "Complaint" refers to the Consolidated Complaint for Violations of the Federal Securities Laws, filed on October 17, 2005, unless otherwise indicated.

Defendants' diametrically opposed views of the merits of the Litigation, Lead Plaintiffs were able to settle this case on terms favorable to the Class.

7.      By the time the settlement was reached, Lead Plaintiffs, through their counsel, interviewed (through investigators retained by Lead Plaintiffs' counsel) 35 confidential sources, opposed Defendants' motion to dismiss, appealed the Court's decision on Defendants' motion to dismiss, initiated written discovery, moved for class certification, and responded to Defendants' discovery requests.  This work permitted Lead Plaintiffs to carefully assess and evaluate both the strengths and the significant weaknesses of the case and to make an informed decision on the best course of action for the Class (*i.e.*, whether to settle, and on what terms, or to continue the Litigation).

8.      As set forth below, despite the fact that certain of Lead Plaintiffs' allegations had support in the evidence and record, many uncertainties remained with respect to key elements of Lead Plaintiffs' claims.  Lead Plaintiffs' class claims could have been denied at class certification or the case could have been dismissed on the merits at summary judgment.  Likewise, Lead Plaintiffs had to weigh the risks associated with taking a complicated securities action like this to trial.

9.      During this action, Defendants raised issues concerning the Complaint's allegations.  Defendants argued that Lead Plaintiffs did not allege and could not prove that the misrepresentations alleged in the Complaint were false, and that the allegations of Defendants' scienter were not properly alleged and could not be proved.

- 4 -

Each of these arguments alone created significant risks to recovery. At the motion to dismiss phase, Defendants succeeded in dismissing Lead Plaintiffs' claims that Defendants made materially false and misleading statements regarding (1) the integration of Tenovis GmbH & Co. KG ("Tenovis"), a company acquired by Avaya; (2) Avaya's ability to meet its aggressive forecasts; (3) the pricing pressure on Avaya's business prior to March 2005; and (4) the success of Avaya's go-to-market strategy. With regard to falsity and scienter, the Court and the Third Circuit Court of Appeals ("Third Circuit") agreed with Defendants that Lead Plaintiffs' allegations were insufficient to demonstrate that (1) Defendants knew that their "forward-looking" statements and statements regarding pricing pressure were false when made; and that (2) the individual Defendants had a reasonable basis upon which to make their projections. However, Lead Plaintiffs' claims regarding pricing discounts on Avaya's business in March 2005 survived after the Third Circuit's partial reversal of this Court's order granting Defendants' motion to dismiss with prejudice. Defendants continued to deny that Lead Plaintiffs could prove falsity and scienter with respect to these statements because they claimed the statements were not false at the time they were made. Moreover, because several of the alleged misrepresentations that Lead Plaintiffs argued were actionable and related to the putative Class's damages were dismissed at the motion to dismiss phase, and such dismissal was upheld on appeal, serious issues concerning Lead Plaintiffs' ability to prove loss causation arose. This added a very significant additional risk to recovery. Indeed, Defendants would

- 5 -

undoubtedly have argued that the resulting drop in Avaya's stock price at the end of the Class Period was the result of news unrelated to Lead Plaintiffs' pricing discount allegations, thereby creating a very real issue concerning whether loss causation could be proved.

10.     While Lead Plaintiffs disagreed with Defendants' contentions concerning falsity, scienter, and loss causation, there was a substantial risk of recovering limited or no damages if the Court or a jury were to side with Defendants' view on any one of these issues.

11.     In reaching the determination to settle the Litigation for $4.5 million, Lead Plaintiffs and their counsel weighed the strengths of their claims against the weaknesses highlighted by Defendants.

12.     In addition, the arguments advanced by Defendants during this Litigation underscored that there were numerous legal and factual issues that were unsettled and that could be decided adversely against Lead Plaintiffs and the Class.  Further, the length of time taken to litigate this case (this action was filed five years ago) poses the risk that Lead Plaintiffs would not be able to obtain evidence due to the inability of witnesses to recall events that happened years ago, the possibility that witnesses have died or become impossible to locate, and the inability to retrieve relevant documents that are five years or older from Avaya and other third-party witnesses.  All of these issues, and their associated risk, were considered by Lead Plaintiffs and their counsel in deciding to settle the Litigation on the agreed terms.

- 6 -

570721_1

13.     On balance, considering all the circumstances and risks faced were the case to continue, Lead Plaintiffs came to the conclusion that settlement on the agreed terms was in the best interests of the Class.

14.     The settlement confers a substantial and certain benefit on the Class and eliminates the significant risks of continued litigation, the outcome of which was far from certain. It is respectfully submitted that the settlement should be approved as fair, reasonable, and adequate and counsel should be awarded attorneys' fees of 25% of the Settlement Fund, or $1.125 million, plus the expenses that were reasonably and necessarily incurred. The proposed Plan of Allocation should also be approved, as it represents a fair and equitable method by which to distribute the net settlement proceeds.

15.     Lead Plaintiffs' counsel have prosecuted this action on a wholly contingent basis and have advanced or incurred all litigation expenses. By doing so, Lead Plaintiffs' counsel have shouldered the risk of an unfavorable result. Lead Plaintiffs' counsel have not received any compensation for their time and expenses while prosecuting the claims of the Class over the course of the last five years. The very complex nature and broad scope of the facts and law underlying the securities violations alleged here have added unusual expenditures to this already otherwise costly prosecution, resulting in substantial expenses of $179,329.86, as well as the investment of 2,243.04 hours of attorney and other para-professional time.

570721_1

16.     The fee application for 25% of the Settlement Fund is fair both to the Class and Lead Plaintiffs' counsel and warrants this Court's approval.  This fee percentage request is within the range of fees frequently awarded in these types of actions and is entirely justified in light of the substantial benefits conferred on the Class, the risks undertaken, the quality of representation, the number of hours expended on the case by counsel, and the nature and extent of legal services performed.

17.     Lead Plaintiffs' counsel also seek approval of the expenses reasonably and necessarily incurred or advanced in prosecuting this complex securities action for the last five years. Lead Plaintiffs' counsel have incurred or advanced expenses in the aggregate of $179,329.86.  This amount includes the substantial fees and expenses of at least one expert consultant, as well as private investigators who helped Lead Plaintiffs' counsel identify, locate, and interview potential witnesses and others with knowledge relevant to the case.

18.     Other major expenses include the electronic storage, travel expenses, as well as online factual and legal research.  As will be seen from the discussion herein of the efforts of Lead Plaintiffs' counsel to achieve this settlement, these expenses were reasonably and necessarily incurred to obtain a successful result.

19.     The following is a summary of the nature of the Class's claims, the principal events that occurred during the course of this Litigation, the legal services

- 8 -

provided by Lead Plaintiffs' counsel, and the specific risks faced by Lead Plaintiffs and the Class.

## II.   SUMMARY OF LEAD PLAINTIFFS' ALLEGATIONS

20.   Lead Plaintiffs sued Defendants for making misrepresentations and omissions regarding Avaya's business success and future business prospects. These statements and omissions caused Avaya's common stock to trade at artificially inflated levels. Lead Plaintiffs and the Class purchased Avaya stock at these inflated levels, and were damaged when Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market causing Avaya stock to fall precipitously. As a result, Lead Plaintiffs alleged that Defendants violated §10(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §78j(b), SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, and §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

21.   Defendant Avaya provides communication systems, applications, and services for enterprises, including businesses, government agencies, and other organizations. During the Class Period (March 2, 2005 – April 19, 2005), the communications provider industry experienced a significant increase in competition from venerable companies such as Cisco and AT&T Solutions, as well as new

upstarts.  ¶8.[5]  These companies all sought to increase their business by luring customers away from Avaya by undercutting prices.  *Id.*

22.    The Complaint initially alleged that Defendants made materially false and misleading statements regarding the following aspects of Avaya: (1) the integration of Tenovis, a company acquired by Avaya; (2) Avaya's ability to meet its aggressive forecasts; (3) the pricing pressure on Avaya's business throughout the class period; and (4) the success of Avaya's go-to-market strategy.

23.    Although certain of these claims were dismissed and upheld on appeal, Lead Plaintiffs' allegations that Defendants' statements in March 2005 concerning pricing pressure were false and misleading survived.  Lead Plaintiffs alleged that Defendants falsely represented that Avaya was growing without sacrificing profitability. ¶¶37-38.  In March 2005, Defendants told the public that Avaya was not experiencing pricing pressure from Cisco or any other competitor companies. ¶¶73, 77-78.

24.    Lead Plaintiffs alleged that Defendants knew that Avaya was experiencing significant pricing pressure from Cisco, AT&T Solutions, and other competitors forcing Avaya to grant unusual 20%-40% discounts which cut projected profit margins severely.  For these reasons, Avaya missed its earnings estimate by

---

[5]    All "¶__" or "¶¶__" references herein are to the Complaint, unless otherwise indicated.

60% and its revenue estimate by almost $100 million. ¶86. These poor financial results were not caused by an industry-wide phenomenon, but were attributable to issues facing Avaya in particular. ¶87. Lead Plaintiffs alleged that the shortfall was directly linked to the very concerns that investors had been inquiring into throughout the Class Period: whether Avaya was experiencing pricing pressures. ¶¶83, 87.

25.    Lead Plaintiffs asserted that Defendants concealed from the investing public the fact that Avaya had been forced by its competition to provide customers with significant and substantial price reductions. ¶79. The Complaint alleged Defendants knew that these discounts prohibited Avaya from remaining profitable and attaining the forecasts Defendants had disseminated to the public. ¶79(b).

26.    Based on the foregoing, Lead Plaintiffs claimed that certain of Defendants' public statements during the Class Period violated §10(b) of the Exchange Act, 15 U.S.C. §78j(b), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5. Lead Plaintiffs further asserted that defendants Avaya, Peterson, and McGuire acted as control persons with regard to the violations of §10(b) of the Exchange Act and were, therefore, liable under §20(a) of the Exchange Act, 15 U.S.C. §78t(a).

## III.    HISTORY OF THE ACTION

### A.    Initiation of the Action and Selection of Lead Plaintiffs

27.    On April 29, 2005, plaintiff Howard Charatz filed a class action complaint against Avaya, Peterson, and McGuire, alleging violations of §§10(b) and

- 11 -

20(a) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder, on behalf of purchasers of Avaya common stock during the period October 5, 2004 and April 19, 2005, inclusive. Subsequently, four additional actions were filed in this District. The abbreviated case names for those actions are: *Gillilland v. Avaya, Inc., et al.*, No. 05-CV-2328; *Levitt v. Avaya, Inc., et al.*, No. 05-CV-2432; *Pine v. Avaya, Inc., et al.*, No. 05-CV-2475; and *Weiman v. Avaya, Inc., et al.*, No. 05-CV-2477.

28.    On June 28, 2005, NEIP, Livonia, District No. 9, and the UFCWs (collectively, the "Institutional Investor Group") moved to consolidate these actions, for its appointment as lead plaintiff, and to approve its choice of counsel, Robbins Geller as lead counsel. On the same day, another group of plaintiffs also moved to be appointed as lead plaintiff and requested approval of their choice of lead counsel. Robbins Geller engaged in substantial briefing on the issue of lead plaintiff, filing oppositions to the other movants' motions, and filing papers in support of Lead Plaintiffs' opening motion.

29.    On August 16, 2005, the Court consolidated all of the filed actions under the case *Charatz v. Avaya, Inc., et al.*, No. 05-CV-2319. The Court also appointed the Institutional Investor Group as Lead Plaintiffs, the law firm of Robbins Geller as Lead Counsel, and the law firm of Cohn Lifland Pearlman Herrmann & Knopf LLP as liaison counsel.

- 12 -

## B.     The Complaint

30.     Lead Counsel engaged in an intensive investigation for the purpose of satisfying the requirements of Rule 9(b) of the Federal Rules of Civil Procedure, the pleading standards imposed by the PSLRA, and the Third Circuit's opinions *In re Suprema Specialties, Inc.* and *In re Advanta Corp.*, with respect to pleading falsity and scienter.  Lead Counsel thoroughly reviewed and analyzed all publicly available information regarding Avaya, including its SEC filings and financial statements, press releases, reports about the Company in the media, and analyst reports.

31.     Working with in-house and independent outside professional investigators, Lead Counsel also sought to identify and interview witnesses with knowledge of the alleged wrongdoing at Avaya.  Lead Counsel, through their investigators, conducted 35 interviews with former employees of Avaya believed to have knowledge of the fraud.  In addition, Lead Counsel consulted with internal forensic accounting experts and economic/damage analysts to assist in the preparation of the Complaint.

32.     On October 17, 2005, Lead Plaintiffs filed the Complaint.  The Complaint greatly expanded the allegations of plaintiff Charatz's initial pleading, adding an additional 40 pages of detailed allegations.

## C.     Motion to Dismiss

33.     On December 16, 2005, Defendants filed a 42-page memorandum of law in support of their motion to dismiss the Complaint, advancing various arguments as

570721_1

to why Lead Plaintiffs' claims should be dismissed with prejudice.  In their motion,

Defendants argued that the Complaint should be dismissed because, *inter alia*, it failed

to allege with specificity why any of Defendants' Class Period statements were false;

Defendants' statements were protected pursuant to the PSLRA's safe harbor

provision; Defendants' misstatements regarding Avaya's future growth and potential

were immaterial as a matter of law; and the Complaint failed to allege with the

requisite particularity that Defendants acted with scienter.  Defendants further argued

that Lead Plaintiffs' §20(a) claim was insufficient as a matter of law.  Accompanying

Defendants' motion was a voluminous declaration with numerous attached exhibits.

34.    On February 14, 2006, Lead Plaintiffs filed their brief in opposition to

Defendants' motion.  In their comprehensive 40-page opposition, Lead Plaintiffs

argued that the Complaint's allegations of falsity were sufficient under the securities

laws because the Complaint adequately identified the "who," "what," "where," and

"when" of the alleged false statements.  Lead Plaintiffs argued that they sufficiently

identified the confidential sources upon which they relied for many of the Complaint's

allegations of falsity.  Lead Plaintiffs further argued that the Complaint, via

allegations of Defendants' knowledge of or access to information that contradicted

their Class Period statements, sufficiently alleged scienter under controlling Third

Circuit authority.  Moreover, Lead Plaintiffs argued that they further substantiated

their scienter allegations by showing Defendants' motives to enter into a credit facility

on more favorable terms, pay off debt with artificially inflated stock, and sell over

- 14 -

350,000 shares of personally-held Avaya stock at inflated prices, reaping over $5 million in gross proceeds. Finally, Lead Plaintiffs countered that many of Defendants' statements were not protected by the "safe harbor" doctrine for forward-looking statements, as the statements were of present facts and were knowingly false when made.

35.    Defendants filed their reply brief in support of their motion to dismiss on March 23, 2006.

36.    On August 14, 2006, the Court held oral argument on Defendants' motion to dismiss.    Thereafter, the Court issued a Memorandum Opinion on September 28, 2006, granting Defendants' motion to dismiss. The Court found that the Complaint failed to establish that all of Defendants' statements were false or misleading when made, and that the allegations failed to demonstrate a strong inference of scienter, as required by the PSLRA. The Court also held that a number of Defendants' statements were protected by the "safe harbor" rule as forward-looking statements.

**D.    Appeal**

37.    On October 27, 2006, Lead Plaintiffs filed a notice of appeal to the United States Court of Appeals for the Third Circuit, appealing the Court's decision to dismiss the Complaint with prejudice and without leave to amend.

38.    On February 20, 2007, Lead Plaintiffs filed their 53-page opening brief arguing that the scienter allegations in the Complaint, when assessed collectively,

were sufficient, especially when considered with Defendants' motives to artificially inflate the price of Avaya's stock.  Lead Plaintiffs also argued that Defendants' statements were knowingly false when made as the statements were linked to specific financial data, and not vague optimism. Additionally, Lead Plaintiffs argued that Defendants' risk warnings were rendered meaningless by Defendants' statements concerning Avaya's current performance and lack of pricing pressure.

39.     On April 9, 2007, Defendants filed their responding appellate brief.  Lead Plaintiffs filed their reply brief on May 3, 2007, countering Defendants' positions on the various issues on appeal.  The Third Circuit heard the parties' oral argument on March 3, 2008.

40.     On April 30, 2009, the Third Circuit issued its opinion, reversing in part and affirming in part the order granting Defendants' motion to dismiss.  In its opinion, the Third Circuit affirmed in large part the dismissal but reversed and remanded as to Lead Plaintiffs' allegation that misrepresentations were made concerning pricing pressure in March 2005.  In addition, the Third Circuit drastically shortened the class period in the case, from October 5, 2004 to April 19, 2005, to only March 2, 2005 to April 19, 2005.

41.     After the remand to this Court, on August 31, 2009, Defendants filed their answer to the Complaint in which they denied all material allegations of the Complaint and raised 28 affirmative defenses.

- 16 -

42.   The parties thereafter met and conferred pursuant to the Court's direction and, in accordance with Fed. R. Civ. P. 26(f), discussed various issues in the case. On November 19, 2009, the parties appeared before the Court for an initial pretrial conference in which deadlines for fact discovery, as well as class certification were set. On December 3, 2009, the Court issued a Pretrial Scheduling Order setting forth the deadlines discussed at the conference.

**E.    Merits Discovery**

43.   On October 15, 2009, Defendants provided Lead Plaintiffs with their initial disclosures pursuant to Fed. R. Civ. P. 26(a)(1). On October 16, 2009, Lead Plaintiffs did the same, providing Defendants with their initial disclosures.

44.   On October 13, 2009, Lead Plaintiffs propounded their first request for production of documents and their first set of interrogatories to Defendants. Lead Plaintiffs also served a notice of deposition of Avaya pursuant to Fed. R. Civ. P. 30(b)(6). On November 16, 2009, Defendants responded and objected to the document requests and interrogatories. Subsequently, the parties met and conferred on numerous occasions to resolve various discovery matters. Indeed, the parties' active and continued discussions regarding Defendants' document production allowed the parties to resolve all of their discovery disputes, without having to resort to the Court for formal resolution.

570721_1

**F.    Class Certification and Class Discovery**

45.    On October 20, 2009, Defendants served their first set of requests for production of documents and their first set of interrogatories to Lead Plaintiffs. Pursuant to the Federal Rules of Civil Procedure, Lead Plaintiffs served objections and responses thereto.

46.    On November 25, 2009, Lead Plaintiffs filed their Motion for Class Certification, seeking certification of the case as a class action and appointment of NEIP, Livonia, and District No. 9 as class representatives.  Because the UFCWs' stock purchases were not in the shortened Class Period resulting from the Third Circuit's decision, Lead Plaintiffs did not seek appointment of the UFCWs as class representatives.

**G.    Settlement Negotiations and Terms of the Settlement**

47.    In or about late November or early December 2009, the parties initiated settlement discussions.  During this time had served written discovery, but decided to postpone discussion of discovery issues in order to engage in settlement discussions. Over the course of approximately the next three to four weeks, counsel for Defendants and counsel for Lead Plaintiffs engaged in frank discussions about the merits of the case and conducted arm's-length negotiations about settlement.   On or about December 22, 2009, those negotiations resulted in an agreement-in-principle to settle the case for $4.5 million.   Thereafter, the parties negotiated a Memorandum of Understanding ("MOU") concerning the settlement, which the parties executed in

- 18 -

January 2010. Subsequent to the execution of the MOU, the parties negotiated a detailed stipulation of settlement which was dated as of March 31, 2010.

48.     On April 6, 2010, a motion for preliminary approval of the settlement and for notice was filed. On June 1, 2010, the Court granted the motion, preliminarily approving the settlement, as well as the form and manner of notice of the settlement to the Class.

49.     The principal lawyers involved in the settlement negotiations are very experienced in securities class actions. I personally participated in the settlement negotiations for the Lead Plaintiffs. I have over 14 years experience in litigating securities class actions, such as the one at the bar. In addition, my firm has litigated such actions for decades, recovering billions of dollars in settlements for shareholders. The attorneys for Defendants also have many years of experience in representing defendants in complex securities class actions. Defense counsel's credentials in the vigorous and effective defense of securities class actions are similarly beyond question.

50.     Lead Plaintiffs' counsel are actively engaged in complex federal civil litigation, particularly the litigation of securities class actions. Our experience in the field allowed us to identify the complex issues involved in this case and to formulate strategies to effectively prosecute them. Our reputations as attorneys, who will zealously prosecute a meritorious case through trial and appeal, as well as our

- 19 -

demonstrated ability to vigorously develop the evidence in this case, put Lead Plaintiffs in a strong position in settlement negotiations with the Defendants.

51.     The settlement resulted from vigorous arm's-length negotiations. In the estimation of Lead Plaintiffs' counsel, the compromise embodied in the Stipulation with Defendants represents a highly successful resolution of a complex class action.

## IV.   FACTORS TO BE CONSIDERED IN SUPPORT OF SETTLEMENT

### A.     The Settlement Was Fairly and Aggressively Negotiated by Counsel

52.     As set forth above, the terms of the settlement were negotiated by the parties at arm's length through adversarial but good faith negotiations. The settlement was the product of multiple discussions between Lead Plaintiffs' counsel and Defendants' counsel. Throughout the course of those negotiations, all parties were represented by counsel with extensive experience in securities litigation in general and securities class actions in particular. The settlement was the result of an adversarial process designed to produce a fair, reasonable, and adequate compromise.

### B.     Serious Questions of Law and Fact Placed the Outcome of the Class Action in Significant Doubt

53.     Another factor considered in assessing the merits of class action settlements – whether serious questions of law and fact exist – supports the conclusion that the settlement is fair, reasonable, and adequate to the Class. As in every complex case of this kind, Lead Plaintiffs and the Class faced obstacles to recovery, both with

- 20 -

respect to liability and damages. While only a small portion of the case remained after the Third Circuit affirmed in large part this Court's dismissal of the Complaint, Lead Plaintiffs believe they could well have prevailed on the merits on the portion of the case that remained. However, Defendants were just as adamant that Lead Plaintiffs would fail.

54. While discovery was in its infancy, Lead Plaintiffs believe that they would have developed sufficient evidence to succeed at class certification, summary judgment, and trial, but realize that they also faced considerable risks and defenses. Lead Plaintiffs are required to prove each and every element of their claims. If this case reached summary judgment and if the Court had granted summary judgment as to even one element of the claims, the entirety of Lead Plaintiffs' case would have been lost. Similarly, if the case proceeded to trial, Lead Plaintiffs would have had to convince each juror they could prevail. A single holdout would have denied Lead Plaintiffs any recovery.

55. As noted above, Lead Plaintiffs took into consideration that establishing Defendants' liability for the alleged false statements required proof not only that Defendants made false or misleading statements with scienter, but that the allegedly undisclosed material information caused a drop in the stock price, resulting in harm to investors. Proving loss causation for Lead Plaintiffs' damages was particularly daunting given that there was a lot of information in the marketplace unrelated to the fraud that caused or at least contributed to Avaya's stock price drop, as opposed to

- 21 -

570721_1

Defendants' alleged fraud. Specifically, Lead Plaintiffs anticipated that Defendants would argue that the Company's April 19, 2005 press release and conference call revealed that its inability to meet its previously stated goals for revenue, operating income, and operating margin was attributable to non-fraud related issues, such as problems integrating Tenovis or an unexpected decision by distributors not to "reload" at the very end of March. Defendants would probably further assert that Avaya's fiscal 2005 performance was not indicative of the fraud because revenue grew 20%, and earnings per share increased from $0.51 to $0.58. Although these merit-based arguments would be premature at the class certification stage, Defendants would likely argue otherwise in an effort to defeat Lead Plaintiffs' class certification motion on loss causation grounds. And the very arguments would be made again, at summary judgment or trial.

56. Defendants vehemently denied Lead Plaintiffs' falsity and scienter allegations, stating that the statements regarding pricing pressure that Avaya faced from its competitors and the granting of unusual 20%-40% discounts about which Lead Plaintiffs complain were not false at the time they were made. Plaintiffs alleged that defendant McGuire falsely denied in March 2005 that Avaya was offering unusual discounts and facing significant pricing pressure from market rivals. Defendants would likely seek to prove that this denial was true when made because the discounts during the Class Period were not unusual and, in fact, were in line with prior practice compared to prior years. Defendants probably would also seek to prove,

- 22 -

*inter alia*, that they could not have known at the time of their alleged false statements in early March 2005 that the impending Q2 results would be disappointing because the shortfall was mostly the product of an unexpected decision by distributors not to "reload" at the very end of March.

57.     As explained herein, even if Lead Plaintiffs could establish falsity and scienter, additional risks would remain in establishing damages. The determination of damages at trial would be a very complicated and uncertain process involving conflicting expert testimony.  The testimony of Lead Plaintiffs' and Defendants' damage experts would likely vary substantially, and in the end, this crucial element at trial would be reduced to a "battle of experts."

58.     Having considered the foregoing, and having evaluated Defendants' likely defenses at class certification, summary judgment, and trial, it is the informed judgment of Lead Plaintiffs' counsel, based upon all proceedings to date and their extensive experience in litigating class actions under the federal securities laws, that the proposed settlement of this matter before this Court is fair, reasonable, and adequate, and in the best interests of the Class.

### C.    The Judgment of the Parties that the Settlement Is Fair and Reasonable Supports Approval of the Settlement

59.     Another factor for the Court to consider in deciding whether to approve class action settlements is the judgment of the parties that the settlement is fair and reasonable.  As outlined above, the settlement was the product of arm's-length

- 23 -

negotiations between adversaries with significant experience in securities class action litigation.

60.     Lead Plaintiffs' counsel believe strongly that the settlement represents a very good resolution for the Class under the circumstances in this case.   The settlement was only reached after an extensive investigation, motion practice, written discovery, and an appeal that greatly narrowed Lead Plaintiffs' case.  With benefit of the briefing related to Defendants' motion to dismiss and the subsequent appellate proceedings which further highlighted the legal and factual issues in this Litigation, Lead Plaintiffs' counsel's view is that this settlement is a highly favorable result under the circumstances.

61.     Furthermore, copies of the Notice of Proposed Settlement of Class Action ("Notice") have been mailed to over 25,500 potential members of the Class.  The date for objection will expire on July 26, 2010, yet as of the date of this declaration there have been no objections to the settlement.  Pursuant to the schedule set by the Court, on or before September 20, 2010, Lead Plaintiffs' counsel will respond to objections, if any, received by the deadline for submission thereof.

## V.     THE PLAN OF ALLOCATION

62.     Pursuant to the Order Preliminarily Approving Settlement and Providing for Notice, and as set forth in the Notice, all Class Members who wish to participate in the distribution of the Settlement Fund must submit a valid Proof of Claim and

570721_1

Release form postmarked on or before September 9, 2010. The Net Settlement Fund shall be distributed according to the Plan of Allocation.

63.     If approved, the Plan of Allocation will govern how the proceeds of the Net Settlement Fund will be distributed among Class Members who submit timely, valid Proof of Claim forms.

64.     The proposed Plan of Allocation provides that:

(a)     A Class Member's share of the fund will depend on the number of valid claim forms that Class Members send in and how many shares of stock Class Members purchased during the relevant period and when they bought and sold them.

(b)     A claim will be calculated as follows:

The allocation below is based on the following price decline as well as the statutory PSLRA 90-day look back amount of $8.71:

April 20, 2005 Price Decline:          $2.68

1.     For shares of Avaya common stock ***purchased or acquired on or between March 2, 2005 through April 19, 2005***, the claim per share shall be as follows:

(a)     If sold prior to April 20, 2005, the claim per share is $0.

(b)     If retained at the end of April 19, 2005 and sold before July 17, 2005, the claim per share shall be the lesser of (i) $2.68 (April 20, 2005 Price Decline), or (ii) the difference between the purchase price and the selling price, or (iii) the difference between the purchase price per share and the average closing price per share up to the date of sale as set forth in the table below.

(c)     If retained or sold on or after July 18, 2005, the claim per share shall be the lesser of (i) $2.68 (April 20, 2005 Price Decline), or (ii) the difference between the purchase price per share and $8.71 per share.

- 25 -

| Date | Closing Price | Average Closing Price |
|------|---------------|------------------------|
| 4/20/2005 | $8.01 | $8.01 |
| 4/21/2005 | $8.08 | $8.05 |
| 4/22/2005 | $8.52 | $8.20 |
| 4/25/2005 | $8.61 | $8.31 |
| 4/26/2005 | $8.65 | $8.37 |
| 4/27/2005 | $8.82 | $8.45 |
| 4/28/2005 | $8.47 | $8.45 |
| 4/29/2005 | $8.68 | $8.48 |
| 5/2/2005 | $8.76 | $8.51 |
| 5/3/2005 | $8.66 | $8.53 |
| 5/4/2005 | $8.87 | $8.56 |
| 5/5/2005 | $8.99 | $8.59 |
| 5/6/2005 | $8.99 | $8.62 |
| 5/9/2005 | $9.08 | $8.66 |
| 5/10/2005 | $8.95 | $8.68 |
| 5/11/2005 | $9.14 | $8.71 |
| 5/12/2005 | $8.85 | $8.71 |
| 5/13/2005 | $8.95 | $8.73 |
| 5/16/2005 | $9.05 | $8.74 |
| 5/17/2005 | $9.00 | $8.76 |
| 5/18/2005 | $9.02 | $8.77 |
| 5/19/2005 | $8.90 | $8.78 |
| 5/20/2005 | $8.94 | $8.78 |
| 5/23/2005 | $9.08 | $8.79 |
| 5/24/2005 | $9.20 | $8.81 |
| 5/25/2005 | $9.11 | $8.82 |
| 5/26/2005 | $9.58 | $8.85 |
| 5/27/2005 | $9.53 | $8.87 |
| 5/31/2005 | $9.15 | $8.88 |
| 6/1/2005 | $8.75 | $8.88 |
| 6/2/2005 | $9.08 | $8.89 |
| 6/3/2005 | $8.99 | $8.89 |
| 6/6/2005 | $8.75 | $8.89 |
| 6/7/2005 | $8.66 | $8.88 |
| 6/8/2005 | $8.80 | $8.88 |
| 6/9/2005 | $8.63 | $8.87 |
| 6/10/2005 | $8.45 | $8.86 |
| 6/13/2005 | $8.43 | $8.85 |

- 26 -

| Date | Closing Price | Average Closing Price |
|---|---|---|
| 6/14/2005 | $8.26 | $8.83 |
| 6/15/2005 | $8.19 | $8.82 |
| 6/16/2005 | $8.25 | $8.80 |
| 6/17/2005 | $8.39 | $8.79 |
| 6/20/2005 | $8.31 | $8.78 |
| 6/21/2005 | $8.44 | $8.77 |
| 6/22/2005 | $8.72 | $8.77 |
| 6/23/2005 | $8.46 | $8.77 |
| 6/24/2005 | $8.26 | $8.75 |
| 6/27/2005 | $8.07 | $8.74 |
| 6/28/2005 | $8.35 | $8.73 |
| 6/29/2005 | $8.50 | $8.73 |
| 6/30/2005 | $8.32 | $8.72 |
| 7/1/2005 | $8.42 | $8.71 |
| 7/5/2005 | $7.98 | $8.70 |
| 7/6/2005 | $7.99 | $8.69 |
| 7/7/2005 | $8.00 | $8.67 |
| 7/8/2005 | $8.06 | $8.66 |
| 7/11/2005 | $8.26 | $8.66 |
| 7/12/2005 | $8.90 | $8.66 |
| 7/13/2005 | $9.35 | $8.67 |
| 7/14/2005 | $9.45 | $8.69 |
| 7/15/2005 | $9.56 | $8.70 |
| 7/18/2005 | $9.18 | $8.71 |

## CALL OPTIONS

1.  For call options on Avaya common stock *purchased from March 2, 2005 through April 19, 2005*, and

    a)  *held* at the end of April 19, 2005, the claim per call option is the difference between the price paid for the call option less the proceeds received upon the settlement of the call option contract;

    b)  *not held* at the end of April 19, 2005, the claim per call option is $0.

- 27 -

2.   For call options on Avaya common stock *written from March 2, 2005 through April 19, 2005*, the claim per call option is $0.

## PUT OPTIONS

1.   For put options on Avaya common stock *written from March 2, 2005 through April 19, 2005*, and

    a)   *held* at the end of April 19, 2005, the claim per put option is the difference between the price paid upon settlement of the put option contract less the initial proceeds received upon the sale of the put option contract;

    b)   *not held* at the end of April 19, 2005, the claim per put option is $0.

2.   For put options on Avaya common stock *purchased from March 2, 2005 through April 19, 2005*, the claim per put option is $0.

Note:  In the case the option was exercised for Avaya common stock, the amount paid, or proceeds received, upon the settlement of the option contract equals the value of the option using Avaya common stock's closing price on the date the option was exercised.

Note:  The combined recovery for the put/call options shall not exceed 3% of the Net Settlement Fund.

The date of purchase or sale is the "contract" or "trade" date as distinguished from the "settlement" date.

65.   The Plan of Allocation was formulated with the assistance of Lead Plaintiffs' economic and damage analysts.  The Plan of Allocation will result in a fair and equitable distribution of the proceeds among the Class Members who suffered economic losses as a result of the alleged fraud and wrongdoing, and who submit valid claims.

## VI.    FACTORS TO BE CONSIDERED IN SUPPORT OF THE REQUESTED ATTORNEYS' FEE AWARD

66.    The Notice provides that Lead Plaintiffs' counsel will seek an award of attorneys' fees of 25% of the Settlement Fund, plus expenses not to exceed $225,000.

67.    Lead Plaintiffs' counsel achieved this favorable result for the Class at great risk and substantial expense to themselves.  They were unwavering in their dedication to the interests of the Class and their investment of the time and resources necessary to bring this Litigation to a successful conclusion.  The requested fee is reasonable based on the quality of Lead Plaintiffs' counsel's work and the substantial benefit obtained for the Class.

68.    The prosecution of this action required Lead Plaintiffs' counsel and their paraprofessionals to perform 2,243.04 hours of work and incur $179,329.86 in expenses.

69.    The resulting lodestar totals $1,184,263.60.  A 25% fee represents a so-called negative multiplier, which is below the range of multipliers awarded in similar cases.

70.    This case was vigorously litigated and settled only after Lead Plaintiffs' counsel had, *inter alia*: (a) conducted some written formal and extensive informal discovery; (b) mastered the relevant facts and dynamics of Avaya's business; (c) drafted and filed the fact-specific Complaint; (d) opposed, appealed, and defeated in part Defendants' motion to dismiss after an extensive and prolonged appeal to the

- 29 -

Third Circuit; (e) drafted and filed a motion for class certification; (f) conducted discovery conferences; (g) attended Court hearings; (h) assessed the risks of prevailing on their claims at trial; and (i) participated in settlement discussions. These efforts and others on the part of Lead Plaintiffs' counsel are described in more detail throughout this declaration.

71.     For their extensive efforts on behalf of the Class, Lead Plaintiffs' counsel are applying for compensation from the Settlement Fund on a percentage basis. The percentage method is the preferred method of fee recovery in the Third Circuit, as it aligns the lawyers' interest in being paid a fair fee with the interest of the class in achieving the maximum recovery in the shortest amount of time required under the circumstances. Here, the percentage method is particularly appropriate given the result and the circumstances under which it was achieved.

72.     Lead Plaintiffs' counsel's compensation for the services rendered was wholly contingent on obtaining a favorable result for the Class. The expenses incurred in the prosecution of the Litigation are set forth in the accompanying declarations and were incurred by the firms on a purely contingent basis. Lead Plaintiffs' counsel, in seeking expenses, have declared that the expenses are reflected in the books and records maintained by the firm and are an accurate recording of the expenses incurred. In total, Lead Plaintiffs' counsel have incurred expenses in the amount of $179,329.86. Included in this amount are the fees paid to consultants and investigators, all of whom provided Lead Plaintiffs and their counsel with extensive

- 30 -

assistance during this Litigation.  Also included in this amount are in-house analysts who provided Lead Plaintiffs with extensive assistance during this Litigation, document copying and imaging and travel expenses, as well as other ordinary and customary pretrial expenses.  I have reviewed the expenses incurred by my firm in detail to make sure that the expenses being requested are reasonable in amount and properly charged to this Litigation.  I believe that all of these expenses for which payment is sought were reasonable and necessarily incurred in connection with the prosecution of the Litigation and should be approved by the Court.

### A.     Extent of Litigation

73.     As described above, this case was settled only after Lead Plaintiffs' counsel had litigated for five years, conducted an investigation into the Class's claims, briefed and partially won an appeal, initiated document discovery, thoroughly researched the facts and law applicable to the Class's claims and Defendants' defenses, consulted with experts, considered the risks of summary judgment and continued litigation, and engaged in settlement negotiations with Defendants' counsel, resulting in a settlement for the Class.

### B.     The Risks of Litigation and the Need to Ensure the Availability of Competent Counsel in High-Risk, Contingent Securities Cases

74.     This Litigation was undertaken by Lead Plaintiffs' counsel on a wholly-contingent basis.  From the outset, Lead Plaintiffs' counsel understood that they were embarking on a complex, expensive, and lengthy litigation with no guarantee of ever

- 31 -

being compensated for the enormous investment of time and money the case would require.  In undertaking that responsibility, Lead Plaintiffs' counsel were obligated to assure that sufficient attorney and paraprofessional resources were dedicated to the prosecution of the Litigation and that funds were available to compensate staff and to pay for the considerable out-of-pocket costs which a case such as this entails.

75.    Because of the nature of a contingent practice where cases are predominantly "big cases" lasting several years, not only do contingent litigation firms have to pay regular overhead, but they also must advance the expenses of the litigation.  With this case having already taken five years, the financial burden on contingent-fee counsel is far greater than on a firm that is paid on an ongoing basis.

76.    In addition to advancing litigation expenses and paying overhead, Lead Plaintiffs' counsel faced the possibility of no recovery.  It is incorrect to presume that a law firm handling complex contingent litigation always wins. Tens of thousands of hours have been expended in losing efforts.  The so-called "risk of litigation" is very real in this type of case.

77.    There are numerous cases where lead plaintiffs' counsel in contingent cases such as this, after the expenditure of thousands of hours, have received no compensation.  It is only because defendants and their counsel know that the leading members of the lead plaintiffs' securities bar are prepared to, and will, force a resolution on the merits and go to trial, or pursue appeals if necessary (as was done in this case), that meaningful settlements in actions such as this can occur.

570721_1

78.     In many hard-fought lawsuits, because of the discovery of facts unknown when the case was commenced, changes in the law during the pendency of the case, or a decision of a judge or jury following a trial on the merits, excellent professional efforts of members of the lead plaintiffs' bar produced no fee for counsel.  Indeed, federal appellate reports are filled with opinions affirming dismissals with prejudice in securities cases. *See, e.g., Catogas v. Cyberonics*, 292 Fed. Appx. 311 (5th Cir. 2008); *Metzler Inv. GMBH v. Corinthian Colls., Inc.*, 540 F.3d 1049 (9th Cir. 2008); *Wollrab v. Siebel Sys.*, 261 Fed. Appx. 60 (9th Cir. 2007); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs.*, 497 F.3d 546 (5th Cir. 2007); *Employers Teamsters Local Nos. 175 & 505 Pension Trust Fund v. Clorox Co.*, 353 F.3d 1125 (9th Cir. 2004); *Goldstein v. MCI Worldcom*, 340 F.3d 238 (5th Cir. 2003); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854 (5th Cir. 2003); *Abrams v. Baker Hughes, Inc.*, 292 F.3d 424 (5th Cir. 2002); *ABC Arbitrage v. Tchuruk*, 291 F.3d 336 (5th Cir. 2002); *In re Vantive Corp. Sec. Litig.*, 283 F.3d 1079 (9th Cir. 2002); *Lipton v. PathoGenesis Corp.*, 284 F.3d 1027 (9th Cir. 2002); *Ronconi v. Larkin*, 253 F.3d 423 (9th Cir. 2001); *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194 (11th Cir. 2001); *Suna v. Bailey Corp.*, 107 F.3d 64 (1st Cir. 1997); *Chill v. GE*, 101 F.3d 263 (2d Cir. 1996); *Glassman v. Computervision Corp.*, 90 F.3d 617 (1st Cir. 1996); *Lovelace v. Software Spectrum*, 78 F.3d 1015 (5th Cir. 1996); *San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris Cos.*, 75 F.3d 801 (2d Cir. 1996); *Acito v. IMCERA Group*, 47 F.3d 47 (2d Cir. 1995); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d

- 33 -

204 (4th Cir. 1994); *Melder v. Morris*, 27 F.3d 1097 (5th Cir. 1994); *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271 (D.C. Cir. 1994); *Shields v. Citytrust Bancorp.*, 25 F.3d 1124 (2d Cir. 1994); *Tuchman v. DSC Commc'ns Corp.*, 14 F.3d 1061 (5th Cir. 1994); *Arazie v. Mullane*, 2 F.3d 1456 (7th Cir. 1993); *In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357 (3d Cir. 1993); *Mills v. Polar Molecular Corp.*, 12 F.3d 1170 (2d Cir. 1993); *Raab v. Gen. Physics Corp.*, 4 F.3d 286 (4th Cir. 1993).

79.    Even when plaintiffs' claims have in large part survived motions to dismiss, the many appellate decisions affirming summary judgments and directed verdicts for defendants show that surviving a motion to dismiss is no guaranty of recovery. *See Shuster v. Symmetricon, Inc.*, 35 Fed. Appx. 705 (9th Cir. 2002); *Green v. Nuveen Advisory Corp.*, 295 F.3d 738 (7th Cir. 2002); *In re Digi Int'l, Inc. Sec. Litig.*, 14 Fed. Appx. 714 (8th Cir. 2001); *Geffon v. Micrion Corp.*, 249 F.3d 29 (1st Cir. 2001); *Oran v. Stafford*, 226 F.3d 275 (3d Cir. 2000); *Greebel v. FTP Software, Inc.*, 194 F.3d 185 (1st Cir. 1999); *Longman v. Food Lion, Inc.*, 197 F.3d 675 (4th Cir. 1999); *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609 (4th Cir. 1999); *In re Comshare Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999); *Levitin v. Painewebber, Inc.*, 159 F.3d 698 (2d Cir. 1998); *Silver v. H&R Block*, 105 F.3d 394 (8th Cir. 1997). Moreover, even lead plaintiffs who succeed at trial may find their judgment overturned on appeal. *See, e.g., Anixter v. Home-Stake Prod. Co.*, 77 F.3d 1215 (10th Cir. 1996) (overturning lead plaintiffs' verdict obtained after two decades of litigation); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (*en banc*) (reversing lead plaintiffs'

- 34 -

verdict for securities fraud and ordering entry of judgment for defendants); *Ward v. Succession of Freeman*, 854 F.2d 780 (5th Cir. 1988) (reversing lead plaintiffs' jury verdict for securities fraud); *Robbins v. Koger Props.*, 116 F.3d 1441 (11th Cir. 1997) (same).

80.    Losses such as those cited above are exceedingly expensive. The fees that are awarded are used to cover enormous overhead expenses incurred during the course of the litigation and are taxed by federal, state, and local authorities. Moreover, changes in the law through legislation or judicial decree can be catastrophic, frequently affecting all of contingent-fee counsel's pending cases.

81.    Courts have repeatedly held that it is in the public interest to have experienced and able counsel enforce the securities laws and regulations pertaining to the duties of officers and directors of public companies. Vigorous private enforcement of the federal securities laws and state corporation laws can occur only if private lead plaintiffs can obtain parity in representation with that available to large corporate interests. If this important public policy is to be carried out, the courts must award fees that will adequately compensate private lead plaintiffs' counsel, taking into account the enormous risks undertaken with a clear view of the economics of a securities class action.

82.    Lead Plaintiffs' counsel undertook to act for the Lead Plaintiffs and the Class in this matter aware that they would be compensated only by obtaining a successful result. The benefits conferred on the Class by this settlement are

- 35 -

570721_1

particularly noteworthy in that a cash Settlement Fund worth $4.5 million (plus accrued interest) was obtained for the Class.

### C.    Standing and Expertise of Lead Plaintiffs' Counsel

83.    The expertise and experience of Lead Plaintiffs' counsel is demonstrated in the Declaration of Jeffrey D. Light on Behalf of Robbins Geller Rudman & Dowd LLP, the Declaration of Eben O. McNair, IV on Behalf of Schwarzwald McNair & Fusco LLP, and the Declaration of Peter S. Pearlman on Behalf of Cohn Lifland Pearlman Herrmann & Knopf LLP, which are being filed concurrently.  They are well-known among their peers and courts across the country as among the most experienced and skilled practitioners in the securities litigation field.

### D.    Standing and Caliber of Opposing Counsel

84.    The Defendants are represented by very experienced counsel from Wilson Sonsini Goodrich & Rosati, P.C. and Archer & Greiner, P.C., which possess substantial experience, expertise, and resources in the defense of complex securities litigation.   In the face of this formidable opposition, Lead Plaintiffs' counsel developed their case so as to persuade the Defendants to settle the case on a basis favorable to the Class.

## VII.  CONCLUSION

85.    For the reasons set forth above and in the accompanying Memorandum of Law in Support of Lead Plaintiffs' Motion for Final Approval of Class Action Settlement and Plan of Allocation of Settlement Proceeds and the Memorandum of

- 36 -

570721_1

Law in Support of Lead Plaintiffs' Counsel's Motion for an Award of Attorneys' Fees and Expenses, I respectfully submit that (a) the settlement is fair, reasonable, and adequate and should be approved; (b) the Plan of Allocation represents a fair method for distribution of the Net Settlement Fund among Class Members and should also be approved; and (c) the application for attorneys' fees and expenses should be granted.

I declare under penalty of perjury that the foregoing is true and correct. If called as a witness, I could and would competently testify thereto.

Executed this 12th day of July, 2010 at San Diego, California.

_____
ARTHUR C. LEAHY